[No. A092653. First Dist., Div. Two. Jan. 2, 2002.]

MARK FERGUSON, Plaintiff and Appellant, v.
FRIENDFINDERS, INC., et al., Defendants and Respondents.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.B.

**COUNSEL**

Law Offices of John L. Fallat, John L. Fallat, Steven D. Schroeder; and Timothy J. Walton for Plaintiff and Appellant.

Rothken Law Firm, Ira P. Rothken and Robert Kovsky for Defendants and Respondents.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, and Seth E. Mermin, Deputy Attorney General, as Amici Curiae.

Carol A. Kunze for The Internet Alliance as Amicus Curiae.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Mark Ferguson (Ferguson) sued respondents for violating California law by sending him unsolicited e-mail advertisements that were allegedly deceptive and misleading. The superior court sustained a demurrer without leave to amend with respect to each of Ferguson's causes of action. In reaching its decision, the lower court found that section 17538.4 of the Business and Professions Code[1] violates the dormant commerce clause of the United States Constitution.

In the published portion of this decision, we hold that section 17538.4 does not violate the dormant commerce clause. In the unpublished portion of

---

[1]Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

this opinion, we conclude that the trial court erred by sustaining a demurrer without leave to amend as to each of Ferguson's causes of action except for the cause of action in which he purported to state a negligence claim.

## II. STATEMENT OF FACTS

### A. *The Statute*

Section 17538.4 regulates conduct by persons or entities doing business in California who transmit unsolicited advertising materials. Section 17538.4, which originally applied only to faxed documents, was amended in 1998 to extend to electronic mail (e-mail).

The statute defines "unsolicited e-mail documents" as "any e-mailed document or documents consisting of advertising material for the lease, sale, rental, gift offer, or other disposition of any realty, goods, services, or extension of credit" when the documents (a) are addressed to recipients who do not have existing business or personal relationships with the initiator, and (b) were not sent at the request of or with the consent of the recipient. (§ 17538.4, subd. (e).)

Section 17538.4 requires that a "person or entity conducting business in this state" who causes an unsolicited e-mail document to be sent (1) establish a toll-free telephone number or valid sender operated return e-mail address that recipients may use to notify the sender not to e-mail further unsolicited documents; (2) include as the first text in the e-mailed document a statement informing the recipient of the toll-free number or return address that may be used to notify the sender not to e-mail any further unsolicited material; (3) not send any further unsolicited advertising material to anyone who has requested that such material not be sent; and (4) include in the subject line of each e-mail message "ADV:" as the first four characters or "ADV:ADLT" if the advertisement pertains to adult material. (§ 17538.4, subds. (a)-(g).)

Section 17538.4 applies to unsolicited e-mailed documents that are "delivered to a California resident via an electronic mail service provider's service or equipment located in this state." "Electronic mail service provider" is defined as "any business or organization qualified to do business in this state that provides individuals, corporations, or other entities the ability to send or receive electronic mail through equipment located in this state and that is an intermediary in sending or receiving electronic mail [(e-mail)]." (§ 17538.4, subd. (d).)

Section 17538.4 states that the section, or any part of it, shall become inoperative when "federal law is enacted that prohibits or otherwise regulates the transmission of unsolicited advertising by electronic mail."

(§ 17538.4, subd. (i).) Although Congress has considered several bills addressing this subject, federal law does not currently regulate the transmission of unsolicited advertising by e-mail.

## B.  *The Complaint*

Ferguson, a California resident, filed a complaint on October 20, 1999, which he amended on January 31, 2000.[2] On behalf of himself and all other persons similarly situated, Ferguson sued Friendfinders, Inc., and Conru Interactive, Inc., two California businesses located in Palo Alto, Andrew B. Conru, a California resident, and 50 Doe defendants (jointly, respondents).

Ferguson alleged that respondents sent him and others unsolicited e-mail advertisements that did not comply with the requirement set forth in section 17538.4. Specifically, Ferguson alleged that "the subject lines of the email messages failed to begin with the characters 'ADV:'; the first line in the text of the e-mail messages failed to contain information about how recipients could have their email addresses removed from future advertising campaigns; the email messages failed to provide a valid return email address to which Plaintiffs could respond; and the headers of the email messages were altered to mask the identity of the sender."

Ferguson attempted to allege four distinct causes of action for which he sought general and special damages, injunctive relief, and attorneys' fees. In his first cause of action for negligence, Ferguson alleged that respondents' violations of section 17538.4 and other California statutes constituted negligence per se. In his second cause of action, Ferguson alleged respondents were liable for trespass for taking possession and control of plaintiffs' "computer processors, hard drives, Random Access Memory and Internet email accounts" without plaintiffs' consent by sending the unsolicited commercial e-mail advertising.

In his third cause of action, Ferguson alleged respondents' transmission of the unsolicited e-mail advertisements constituted an unfair business practice under California law because respondents' e-mails (1) were designed to deceive and mislead plaintiffs as to the origin of the transmission, (2) were actually misleading and deceptive, and (3) violated section 17538.4. Citing these same reasons, Ferguson alleged a fourth cause of action for unlawful advertising practices.

## C.  *Proceedings in the Lower Court*

Respondents filed their demurrer to the complaint on March 3. They argued that Ferguson failed to state a cause of action for negligence, that

---

[2]All further dates are in 2000 unless otherwise indicated.

sending unsolicited e-mail cannot constitute a trespass as a matter of law, and that Ferguson's third and fourth causes of action for unfair business practices and unlawful advertising practices were flawed in several respects. Among other things, respondents alleged that the relief sought with respect to Ferguson's third and fourth causes of action "would constitute an unconstitutional interference with interstate commerce." In this regard, respondents argued that the Internet cannot be regulated by individual states because it is a national infrastructure without territorial boundaries.

A hearing on respondents' demurrer was held on March 30. At that hearing, the trial court indicated that Ferguson had failed to state a cause of action for negligence because respondents' conduct was intentional, and that Ferguson could not prove that plaintiffs were actually damaged by the alleged trespass. The discussion as to the third and fourth causes of action was limited to the question whether section 17538.4 violates the dormant commerce clause of the federal Constitution. After taking the matter under submission, obtaining additional briefing on this discrete issue, and holding a second hearing on May 18, the court issued an order on June 7. That order sustained respondents' demurrer without leave to amend on the following ground: "California Business and Professions Code section 17538.4 unconstitutionally subjects interstate use of the Internet to inconsistent regulations, therefore violating the dormant Commerce Clause of the United States Constitution."[3] Judgment was entered on July 17 and this timely appeal followed.

## III. Discussion

Ferguson disputes the lower court's conclusion that section 17538.4 is unconstitutional, as does the Attorney General, who has filed an amicus curiae brief in this court. Ferguson also argues his entire complaint is viable without section 17538.4. We begin our analysis by addressing the constitutional issue presented and will then consider the adequacy of Ferguson's pleading.

---

[3]We take judicial notice of this order which the parties failed to include the appellate record, but which appellants produced pursuant to our request. (Evid. Code, § 452, subds. (c) & (d).)

Notwithstanding the broad language employed in both the lower court's order and judgment, its constitutional ruling implicates only the provisions of section 17538.4 which regulate e-mail advertising. The constitutionality of the provisions of section 17538.4 which regulate the faxing of unsolicited commercial materials was not questioned below and is not at issue in this appeal.

### A. *Respondents Did Not Establish That Section 17538.4 Is Unconstitutional*

#### 1. *Scope of review*

The trial court found that respondents sustained their burden of proving that section 17538.4 is unconstitutional on its face. ■ "A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) The challenger must " ' "demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Ibid.*)

#### 2. *Dormant commerce clause*

■ The commerce clause provides that "Congress shall have power . . . [¶] . . . [¶] [t]o regulate commerce . . . among the several states . . . ." (U.S. Const., art. I, § 8, cl. 3.) "[T]his affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." (*Healy v. The Beer Institute* (1989) 491 U.S. 324, 326, fn. 1 [109 S.Ct. 2491, 2494, 105 L.Ed.2d 275] (*Healy*).) In other words, the dormant commerce clause precludes state regulation in certain areas "even absent congressional action." (*CTS Corp. v. Dynamics Corp. of America* (1987) 481 U.S. 69, 87 [107 S.Ct. 1637, 1648, 95 L.Ed.2d 67].)

"[A]s the volume and complexity of commerce and regulation have grown in this country, the Court has articulated a variety of tests in an attempt to describe the difference between those regulations that the Commerce Clause permits and those regulations that it prohibits. [Citation.]" (*CTS Corp. v. Dynamics Corp. of America, supra*, 481 U.S. at p. 87 [107 S.Ct. at p. 1648].) Supreme Court authority establishes two primary lines of inquiry: "first, whether the ordinance discriminates against interstate commerce, [citation], and second, whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits,' [citation]." (*C & A Carbone, Inc. v. Clarkstown* (1994) 511 U.S. 383, 390 [114 S.Ct. 1677, 1682, 128 L.Ed.2d 399] (*C & A Carbone*).)

With respect to the first inquiry, regulations that discriminate against out-of-state actors are subject to "rigorous scrutiny." (*C & A Carbone, supra*, 511 U.S. at pp. 390-392 [114 S.Ct. at pp. 1682-1683]; see also *CTS Corp. v. Dynamics Corp. of America, supra*, 481 U.S. at p. 87 [107 S.Ct. at p. 1648] ["The principal objects of dormant Commerce Clause scrutiny are statues that discriminate against interstate commerce."].) "Discrimination against

interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. [Citation.]" (*C & A Carbone, supra,* 511 U.S. at p. 392 [114 S.Ct. at p. 1683].)

This first level inquiry, which applies a strict scrutiny analysis, has been extended to state regulations that directly regulate interstate commerce. (See, e.g., *Healy, supra,* 491 U.S. at pp. 336-337 [109 S.Ct. at pp. 2499-2500]; *Brown-Forman Distillers v. N.Y. Liquor Auth.* (1986) 476 U.S. 573, 579 [106 S.Ct. 2080, 2084, 90 L.Ed.2d 552]; see also *S.D. Myers v. City and County of San Francisco* (9th Cir. 2001) 253 F.3d 461, 466-467.) State laws that regulate commerce occurring outside state borders have been found to offend the dormant commerce clause. (*Ibid.*)

The second inquiry, which is employed to evaluate regulations that do not discriminate against interstate commerce or directly regulate it, is a balancing test which requires that a court uphold a state regulation that serves an important public interest unless the benefits of that regulation are outweighed by the burden imposed on interstate commerce. (*C & A Carbone, supra,* 511 U.S. at pp. 390-392 [114 S.Ct. at pp. 1682-1683]; *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174].) In the court's own words, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." (*Pike v. Bruce Church, Inc., supra,* 397 U.S. at p. 142 [90 S.Ct. at p. 847]; see also *Edgar v. MITE Corp.* (1982) 457 U.S. 624, 640 [102 S.Ct. 2629, 2639-2640, 73 L.Ed.2d 269]; *People v. Hsu* (2000) 82 Cal.App.4th 976, 982 [99 Cal.Rptr.2d 184].)

### 3. *Strict scrutiny analysis*

In the present case, respondents concede that section 17538.4 does not discriminate against out-of-state actors. The statute applies equally to in-state and out-of-state actors who (a) do business in California and (b) transmit unsolicited commercial e-mail (UCE) to a California resident, (c) via equipment located in California.

However, respondents contend that section 17538.4 directly regulates interstate commerce. Citing *Healy, supra,* 491 U.S. 324, they argue that, when section 17538.4 is viewed in the context of Internet reality, the statute regulates beyond California's borders and that its extraterritorial reach violates the dormant commerce clause.

In *Healy*, the United States Supreme Court struck down provisions of a Connecticut statute that required out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers were no higher than the prices at which those products were sold in states bordering Connecticut. The *Healy* court found that Connecticut's price affirmation statute violated the dormant commerce clause because (1) it discriminated against brewers and shippers of beer engaged in interstate commerce and (2) it directly controlled commerce occurring wholly outside the state. (*Healy, supra*, 491 U.S. 324.)

In support of the latter of these two holdings, the *Healy* court identified several principles from prior cases "concerning the extraterritorial effects of state economic regulations . . . ." (*Healy, supra*, 491 U.S. at p. 336 [109 S.Ct. at p. 2499].) First, a state statute that directly regulates commerce occurring wholly outside the boundaries of the state violates the commerce clause. (*Id.* at p. 336 [109 S.Ct. at p. 2499].) Second, a state statute that directly "controls" commerce occurring wholly outside the boundaries of the state also violates the commerce clause. Third, to determine whether a statute impermissibly controls commerce outside the state, a court should evaluate the practical effect of the statute by considering "the consequences of the statute itself . . . [and] how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." (*Ibid.*) Applying these principles, the *Healy* court found that Connecticut's price affirmation statute violated the dormant commerce clause because it had the practical effect of controlling beer prices in other states. (*Id.* at pp. 338-340 [109 S.Ct. at pp. 2500-2502].)

Section 17538.4 does not violate the principles discussed in *Healy* because it does not directly regulate commerce occurring wholly outside the state. It expressly applies only when UCE is sent to a California resident by means of an e-mail service provider who has equipment in the state. Respondents contend, however, that the practical effect of section 17538.4 is to control commerce occurring wholly outside California because the geographic limitations set forth in section 17538.4 are ineffectual and, therefore, senders of UCE who do business in California must always comply with section 17538.4 regardless of the actual residence of the UCE recipient. Respondents offer several theories to support their claim that section 17538.4 has an impermissible extraterritorial reach.

First, respondents argue that the geographic limitations on the scope of section 17538.4 are ineffectual because of the very nature of the Internet. UCE is transmitted via the Internet which functions in cyberspace, a place respondents characterize as being "wholly insensitive to geographic distinctions." (*American Libraries Ass'n v. Pataki* (S.D.N.Y. 1997) 969 F.Supp.

160, 170 (*Pataki*).) Thus, respondents maintain, an e-mail address simply does not logically correspond to a geographic residence.

The problem with this argument is that section 17538.4 does not regulate the Internet or Internet use per se. It regulates individuals and entities that (1) do business in California, (2) utilize equipment located in California, and (3) send UCE to California residents. The equipment used by e-mail service providers does have a geographic location. And e-mail recipients are people or businesses that function in the real world and have a geographic residence.

Respondents mistakenly rely on *Pataki, supra*, 969 F.Supp. 160. In that case, the court found that a state law making it a crime to use a computer to disseminate obscene materials to a minor violated the dormant commerce clause. (*Id.* at p. 163.) The court found that the law regulated conduct occurring wholly outside the state and that its burden on interstate commerce exceeded its local benefit. (*Id.* at p. 169.) In reaching this conclusion, the *Pataki* court emphasized that the nature of the Internet, particularly its insensitivity to geographic distinctions, "makes it impossible to restrict the effects of the New York Act to conduct occurring within New York." (*Id.* at p. 177.) More generally, the court concluded that the Internet is an area of commerce "that must be marked off as a national preserve to protect users from inconsistent legislation that, taken to its most extreme, could paralyze development of the Internet altogether." (*Id.* at p. 169.)

Initially, we join the other California courts that have addressed this issue by rejecting *Pataki*'s holding that any state regulation of Internet use violates the dormant commerce clause. (See *Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 194-195 [94 Cal.Rptr.2d 453] [Pen. Code, § 288.2, which makes it a crime to transmit harmful matter over the Internet to a child, does not violate the commerce clause]; *People v. Hsu, supra,* 82 Cal.App.4th at p. 983 [same].) "The Internet is undeniably an incident of interstate commerce, but the fact that communication thereby can affect interstate commerce does not automatically cause a state statute in which Internet use is an element to burden interstate commerce." (*People v. Hsu, supra,* 82 Cal.App.4th at p. ·983, fn. omitted.)

In any event, the *Pataki* court's conclusions about the extraterritorial effects of the New York law in that case do not apply to section 17538.4. The statute at issue in *Pataki* applied to *all Internet activity* and the court's comments about the absence of geographic sensitivity were made in that context. (*Pataki, supra,* 969 F.Supp. at p. 171.) As we have already explained, section 17538.4 does not regulate the Internet. It regulates e-mail users who send UCE to California residents via equipment located in

California. These limitations distinguish section 17538.4 from the New York statute at issue in *Pataki* and avoid the problems which most concerned the *Pataki* court.

Respondents argue that, even if e-mail recipients do have geographic residences, it is simply not possible for senders of UCE to determine the residency of any particular e-mail recipient. Thus, respondents argue that the only way to avoid violating section 17538.4 is to comply with it in every instance. This argument has two fatal flaws. First, respondents ignore the second geographic limitation imposed by section 17538.4: it applies only when equipment' located in the state is used. By limiting the scope of section 17538.4 to UCE's that are transmitted via equipment located in the state, our Legislature ensured that the statute would not reach conduct occurring "wholly" outside the state.

Second, the record does not support respondents' claim that it is impossible to determine the geographic residence of a UCE recipient. Both the Attorney General and Ferguson dispute this contention. They suggest that lists of e-mail addresses sorted by geographic residence exist already or can be created and utilized by senders of UCE. Respondents have offered no evidence supporting a contrary conclusion. Instead, they argue that "[t]ypically unsolicited email advertising is sent in 'bulk,' that is to lists of recipients processed by automation" and that "[t]here is no practical way to ascertain which addresses are California residents." That respondents consider section 17538.4's requirements inconvenient and even impractical does not mean that statute violates the commerce clause. Further, if respondents choose to comply with section 17538.4 all the time (so they can avoid having to determine whether they are corresponding with California residents via equipment located in California), that is their business decision. Such a business decision simply does not establish that section 17538.4 controls conduct occurring wholly outside California.

Respondents argue that, even if the residence of an e-mail recipient can be determined, section 17538.4 reaches commerce occurring wholly outside the State because it applies to a California resident who receives and/or opens his or her UCE while in a location outside California. This very argument was rejected by the Supreme Court of Washington in *State v. Heckel* (2001) 143 Wash.2d 824 [24 P.3d 404] (*Heckel*), a case upholding a statute analogous to section 17538.4 against a dormant commerce clause challenge. Like the Washington statute at issue in *Heckel*, section 17538.4 does not purport to regulate when or where UCE recipients may read their e-mail. And, the question posed by this hypothetical—whether the statute must or should be construed to apply to state residents when they are out of state—is a "jurisdictional question not at issue in this case." (*Heckel, supra*, 24 P.3d at p. 412.)

Respondents argue that another practical effect of section 17538.4 is that it conflicts with statutes regulating UCE that have been enacted by other states. Notwithstanding the fact that, to date, at least 18 states have enacted laws regulating UCE (*Heckel, supra,* 24 P.3d at pp. 411-412), respondents have identified only one actual conflict pertaining to one requirement imposed by section 17538.4. Section 17538.4, subdivision (g), requires that the subject line of the UCE include "ADV:ADLT" as its first eight characters if the message contains adult information. Respondents contend this requirement directly conflicts with a Pennsylvania statute which requires that the first nine characters of a subject line of a UCE containing explicit sexual materials be "ADV-ADULT" if the UCE is transmitted to a person "within this Commonwealth." (18 Pa. Cons. Stat. § 5903(a.1).)

Respondents' argument that section 17538.4 conflicts with Pennsylvania law fails at its base because they have not established that the geographic limitations imposed by section 17538.4 are ineffectual. In other words, although respondents have found a minor distinction between California and Pennsylvania law, they have not shown that a UCE sender would ever face a situation in which he or she was required to comply with both laws at the same time.[4] The commerce clause protects against inconsistent regulations in order to prevent "the projection of one state regulatory regime into the jurisdiction of another." (*Healy, supra,* 491 U.S. at pp. 336-337 [109 S.Ct. at p. 2499].) Respondents have not established that section 17538.4 has such an effect.

We conclude that section 17538.4 does not discriminate against or directly regulate or control interstate commerce. Therefore, section 17538.4 does not violate the commerce clause if it serves a legitimate local public interest and if the burden it imposes on interstate commerce is not excessive when viewed in light of its local benefits.

### 4. *The balancing test*

#### a. *The state interest*

As noted, section 17538.4 regulates the amount of UCE sent to residents of the state by establishing and enforcing a mechanism for residents to have their names removed from UCE mailing lists. It also regulates the content of UCE sent to state residents by imposing truthfulness and disclosure requirements on UCE senders.

---

[4]Assuming that an originator of UCE faced a legal challenge because it complied with the subject line requirement of one state's law, but not the other's, we would expect that the doctrine of substantial compliance would be utilized to defend against a legal challenge to that usage. (Cf. *Asdourian v. Araj* (1985) 38 Cal.3d 276, 283-284 [211 Cal.Rptr. 703, 696 P.2d 95].)

Like traditional paper "junk" mail, UCE can be annoying and waste time. But courts and commentators have acknowledged that UCE causes many additional problems. (See, e.g., *Heckel, supra,* 24 P.3d 404; *CompuServe Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F.Supp. 1015, 1022; *America Online Inc. v. IMS* (E.D.Va. 1998) 24 F.Supp.2d 548, 550; Goldsmith & Sykes, *The Internet and the Dormant Commerce Clause* (2001) 110 Yale L.J. 785 (hereafter *The Internet and the Dormant Commerce Clause*); Whang, *An Analysis of California's Common and Statutory Law Dealing With Unsolicited Commercial Electronic Mail: an Argument for Revision* (2000) 37 San Diego L.Rev. 1201 (hereafter *An Argument for Revision*); Sorkin, *Technical and Legal Approaches to Unsolicited Electronic Mail* (2001) 35 U.S.F. L.Rev. 325 (hereafter *Technical and Legal Approaches*).)

These additional problems have developed because UCE is easy and inexpensive to create, but difficult and costly to eliminate. UCE, often referred to as "spam,"[5] can be and usually is sent to many recipients at one time at little or no cost to the sender. Since the cost of sending unsolicited bulk e-mail is "negligible," spammers "have little incentive to consume resources in an efficient manner." (*Technical and Legal Approaches, supra,* 35 U.S.F. L.Rev. at p. 338.) Studies indicate that 10 to 30 percent of all e-mail sent on a given day consists of UCE. (*An Argument for Revision, supra,* 37 San Diego L.Rev. at pp. 1202-1203.)

In contrast, the costs created by UCE are substantial. Internet Service Providers (ISP's) incur significant business-related costs accommodating bulk e-mail advertising and dealing with the problems it creates. ISP's attempt to defray those costs by charging higher fees to their customers. Individuals who receive UCE can experience increased Internet access fees because of the time required to sort, read, discard and attempt to prevent future sending of UCE. If the individual undertakes this process at work, his or her employer suffers the financial consequences of the wasted time. (See *An Argument for Revision, supra,* 37 San Diego L.Rev. at p. 1203.)

The financial harms caused by the proliferation of UCE have been exacerbated by the use of deceptive tactics, which are used to disguise the identity of the UCE sender and the nature of his or her message. Such deceptive tactics increase the already significant costs that UCE imposes on Internet users. (See generally *Heckel, supra,* 24 P.3d at pp. 409-411.) For

---

[5]"Use of the term 'spam' as Internet jargon for this seemingly ubiquitous junk e-mail arose out of a skit by the British comedy troupe Monty Python, in which a waitress can offer a patron no single menu item that does not include spam . . . . [Citations.] Hormel Food Corporation, which debuted its SPAM® luncheon meat in 1937, has dropped any defensiveness about this use of the term and now celebrates its product with a website . . . . [Citations.]" (*Heckel, supra,* 24 P.3d at p. 406, fn. 1.)

example, by disguising the nature and origin of their messages, spammers evade attempts to filter out their messages and force ISP's to incur additional costs attempting to return messages to nonexistent addresses or otherwise dispose of undeliverable messages. Likewise, e-mail recipients cannot easily identify unwanted UCE or promptly or effectively contact senders of such messages to request that future mailings not be sent. Furthermore, by using fraudulent domain names and return e-mail addresses, senders misdirect responses to their messages to innocent third parties who can suffer serious economic consequences. (*Ibid.*)

This "cost-shifting" from senders of deceptive UCE to Internet businesses and e-mail users "has been likened to sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone." (*Heckel, supra,* 24 P.3d at p. 410.) As noted above, the *Heckel* court found that a Washington law regulating UCE did not violate the dormant commerce clause. Among other things, the Washington statute prohibits deceptive subject line descriptions and misrepresentation of the sender's identity. (*Id.* at p. 407.) In upholding these provisions, the *Heckel* court found that states have a substantial interest in preventing the cost-shifting which is inherent in the sending of deceptive UCE. (*Id.* at p. 410.)

We agree with the *Heckel* court that protecting a state's citizens from the economic damage caused by deceptive UCE constitutes a " 'legitimate local purpose.' " (*Heckel, supra,* 24 P.3d at p. 410.) In addition, we find that deceptive UCE poses noneconomic dangers as well. Deceptive UCE can be difficult if not impossible to identify without opening the message itself. Having to take that extra step can be more than a waste of time and money. Studies indicate that UCE often contains offensive subject matter, is a favored method for pursuing questionable if not fraudulent business schemes, and has been successfully used to spread harmful computer viruses. (*An Argument for Revision, supra,* 37 San Diego L.Rev. at p. 1203 & fn. 9.)

We find that California has a substantial legitimate interest in protecting its citizens from the harmful effects of deceptive UCE and that section 17538.4 furthers that important interest. By requiring disclosure of the advertising and/or adult nature of an unsolicited e-mail in the subject line, section 17538.4 establishes a quick and simple way of identifying UCE without having to read it first. By requiring establishment and disclosure of a legitimate procedure for responding to a UCE, section 17538.4 holds UCE senders accountable for their actions. And, by requiring that senders of UCE honor requests that future mailings not be sent to recipients who do not want them, section 17538.4 protects California residents from all of the potential harms associated with unwanted UCE.

b.  *The burden on interstate commerce*

We must next consider whether the burden that section 17538.4 imposes on interstate commerce outweighs the benefits of that statute.

To the extent that section 17538.4 requires truthfulness in advertising, it does not burden interstate commerce at all "but actually 'facilitates it by eliminating fraud and deception.' [Citation.]" (*Heckel, supra,* 24 P.3d at p. 411.) Further, as the *Heckel* court found, " 'truthfulness requirements . . . make spamming unattractive to many fraudulent spammers, thereby reducing the volume of spam.' " (*Ibid.,* quoting *The Internet and the Dormant Commerce Clause, supra,* 110 Yale L.J. at p. 819.) Nor do the statute's affirmative disclosure requirements impose any appreciable burden on senders of UCE. As the Attorney General has observed, the cost of placing particular letters in the subject line of the e-mail and including a valid return address in the message itself "is appreciably zero in terms of time and expense." Finally, respondents do not identify any burden on interstate commerce arising from the requirement that an express request to be eliminated from a UCE sender's mailing list must be honored. Any conceivable burden clearly does not outweigh the local benefits of section 17538.4.

We conclude that the burdens imposed on interstate commerce by section 17538.4 are minimal and do not outweigh the statute's benefits. Therefore, respondents have failed to carry their burden of proving that section 17538.4 violates the dormant commerce clause.

B.  *Adequacy of Ferguson's Complaint**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## IV.  DISPOSITION

The lower court's ruling sustaining the demurrer without leave to amend as to Ferguson's first cause of action for negligence is affirmed. In all other respects, the judgment is reversed and this case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are awarded to Ferguson.

Kline, P. J., and Lambden, J., concurred.

On January 14, 2002, the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied April 10, 2002. George, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 1255.