[No. H030976. Sixth Dist. Apr. 8, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN GARELICK, Defendant and Appellant.

**COUNSEL**

Carl A. Gonser, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PREMO, J.**—Defendant Brian Garelick was charged by information with an attempted lewd or lascivious act on a child under 14 (Pen. Code, §§ 664, 288, subd. (a)),[1] attempted distribution or exhibition of harmful matter to a minor (§§ 664, 288.2, subd. (b)), and misdemeanor possession of child pornography (§ 311.11, subd. (a)). After a jury trial, Garelick was found guilty on all counts. The trial court suspended imposition of sentence, placed Garelick on three years' probation and ordered him to serve 365 days in county jail on the charge of attempted lewd or lascivious act, a consecutive 101 days on the charge of attempted distribution or exhibition of harmful matter, and a concurrent sentence of six months in county jail on the charge of misdemeanor possession of child pornography, with credit for time served.

On appeal, Garelick contends that the trial court committed instructional error and challenges the constitutionality of section 288.2, subdivision (b) (hereafter section 288.2(b)). We reject these arguments and shall affirm.

---

[1] All further statutory references are to the Penal Code, unless otherwise specified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Presentation of the evidence

On May 13, 2005, Milpitas Police Sergeant Daryl Sequeria was posing as a 13-year-old girl named Suzzi in an Internet chat room, when he was contacted by Garelick. Garelick sent "Suzzi" an instant message, using the screen name "punkbudy." After Garelick told "Suzzi" that he was a minor, "Suzzi" responded that she was not interested in chatting with him, "because he was basically too young."[2] Garelick responded that he had an older brother and asked if "Suzzi" would be interested in "talking" to the older brother. When "Suzzi" replied to the effect of "Sure, whatever," Garelick signed out as "punkbudy," signed in again as "TeKnEEk408," and contacted "Suzzi," claiming to be the older brother of "punkbudy."

Garelick informed "Suzzi" that he was 19 years old. The online conversation began to have sexual overtones and Garelick asked "Suzzi" about her past sexual experiences with men. Garelick also admitted that he was, in fact, "punkbudy." Because Garelick had previously been posing as a juvenile online, trying to talk to what he thought was a 13-year-old girl, Sergeant Sequeria prioritized the case and, as "Suzzi," offered to meet with Garelick at a local park. "Suzzi" asked that Garelick bring a specific brand of condoms with him, as well as a specific flavor and brand of chewing gum.

Sergeant Sequeria and other officers set up surveillance at the park. When Garelick arrived at the park, he got out of his car and jogged around, whistling and saying, "Pssst." Officers then approached him and placed him under arrest. In his right front pants pocket, Garelick had a package of the same brand of condoms "Suzzi" had asked him to bring to the park. In Garelick's car, police found a pack of gum—the same flavor and brand that "Suzzi" had asked him to bring—along with handwritten directions to the park.

Garelick consented to police searching his computer, which was retrieved from his house. Upon searching the hard drive, police discovered four images which were identical to images already present on law enforcement databases and identified as suspected child pornography.[3] These four images were

---

[2] Sergeant Sequeria testified that he had no interest in pursuing a case against "punkbudy," because "punkbudy" had claimed to be a minor.

[3] According to the People's expert in computer forensics and identification of child pornography, investigator Mark Swineford, image files found on a computer are reviewed by means of "hash value analysis," in which the images are converted, by means of an algorithm, into a unique "hash value." The "hash values" of the images found on Garelick's computer

admitted into evidence at trial as direct evidence to support the possession of child pornography charge.

In addition, police found a number of other "questionable" images that were indicative of child pornography in several different locations on the computer's hard drive. At trial, the People offered, pursuant to Evidence Code section 1101, subdivision (b) (hereafter Evidence Code section 1101(b)), 131 of these other images found on Garelick's computer.[4] Garelick objected on the grounds that it was possible that these images could have been cached on his computer without his ever viewing them or even knowing they were there.

The trial court eventually admitted 118 of the 131 images taken from Garelick's computer.[5] Upon the admission of this evidence, however, the trial court advised the jurors that these 118 images had been admitted for a limited purpose and that they would be instructed on how they should receive and evaluate that evidence at the close of the trial.

B. *Challenged jury instructions*

1. *CALCRIM No. 375*

At the close of trial, the jury was instructed, pursuant to Judicial Council of California Criminal Jury Instructions (2007–2008) CALCRIM No. 375, that "[t]he People presented evidence of other behavior by [Garelick] that was not charged in this case that [Garelick] possessed controlled matter allegedly depicting persons under the age of eighteen engaging in or simulating sexual intercourse specifically in People's 8: Images found in My Share folder Owner's Desktop folder, Internet cache and drive free space. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that [Garelick], in fact, committed the uncharged acts. Proof by a preponderance of the evidence is a different [burden of] proof than proof beyond a reasonable doubt. [¶] A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that [Garelick] committed the uncharged act, you may but are not required to consider the evidence—that evidence for the

were then compared against "hash values" of previously identified and suspected child pornography contained on the law enforcement databases.

[4] The images were found in various locations on Garelick's computer, including the Internet cache, the hard drive's free space, as well as in the "Owner's Desktop" folder, and a folder entitled "My Shared."

[5] The trial court denied admission of 13 images, finding that they were more prejudicial than probative under Evidence Code section 352.

limited purpose of deciding whether or not [Garelick] acted with the intent to attempt to commit a lewd act upon a child under 14 or attempt to send harmful matter to a minor; [Garelick] had a motive to commit the offenses alleged in this case or [Garelick] knew the existence of child pornography on a mass storage device when he allegedly acted in this case or [Garelick] had a plan to commit the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offenses. Do not conclude from this evidence that [Garelick] has a bad character or is disposed to commit a crime. If you conclude that [Garelick] committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence. [¶] It is not sufficient by itself to prove [Garelick] is guilty of counts one, two, and three. The People must still prove each element of every charge beyond a reasonable doubt."

Before this instruction was given, Garelick's counsel argued that it should be modified to require the jury to make a preliminary finding of fact as to whether or not the "alleged other behavior was committed with the required specific intent or mental state" before it could consider the evidence in question. The trial court refused the proposed modification.

### 2. CALCRIM No. 220

The trial court also gave the following modified CALCRIM No. 220 instruction: "The fact that a criminal charge has been filed against [Garelick] is not evidence that the charge is true. You must not be biased against [Garelick] just because he has been arrested, charged with a crime or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. [¶] Unless the evidence proves [Garelick] guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

Garelick objected to CALCRIM No. 220 as given and requested that the court instruct the jury that the reasonable doubt standard must apply to every

fact and element necessary to prove the crime. Garelick also requested that the trial court give guidance to the jury as to the meaning of the phrase "abiding conviction," and suggested that the trial court instruct the jury that "[a]n abiding conviction based upon proof beyond a reasonable doubt is the highest level of certainty recognized in the law." Again, the trial court rejected defense counsel's suggested modifications.

## II. DISCUSSION

### A. *The trial court did not err by failing to modify CALCRIM No. 375 as requested*

On appeal, Garelick renews his argument that the trial court should have instructed the jury that, before it could consider the 118 images found on his computer as evidence of intent, motive, preparation or plan under Evidence Code section 1101(b), it should make a preliminary finding of fact that he possessed or controlled the images with the "required specific intent or mental state" to violate section 311.11.

█ Subject to the trial court's discretion under Evidence Code section 352, evidence of a defendant's uncharged acts may be admitted into evidence under Evidence Code section 1101(b) when relevant to prove some fact, such as motive, intent, preparation, or plan, other than his disposition to commit such an act. Such evidence of other uncharged crimes may be introduced once its proponent establishes, by a preponderance of evidence, both the fact of the prior offense and the defendant's connection to it. (See, e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 380–383 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Medina* (1995) 11 Cal.4th 694, 763 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Under the Evidence Code, the truth of the prior uncharged act and defendant's connection to it are preliminary factual issues which must be decided before the prior misconduct can be deemed admissible; if the prior and defendant's connection to it are not established by a preponderance of the evidence, the prior is irrelevant to prove the Evidence Code section 1101(b) fact for which it is being offered. (*People v. Simon* (1986) 184 Cal.App.3d 125, 129–130 [228 Cal.Rptr. 855] (*Simon*); see Evid. Code, § 403, subd. (a).)

█ "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*), quoting *People v. Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355].) However, the least degree of similarity between the uncharged and charged acts is sufficient to prove intent because the recurrence of a similar result tends to negative accident, inadvertence, good faith, or other innocent mental state. (*Ewoldt, supra,* 7 Cal.4th at p. 402.)

*Simon,* on which Garelick relies to support his argument, involved a defendant charged with murder who had shot a man in his former girlfriend's house. (*Simon, supra,* 184 Cal.App.3d at pp. 127–129.) The defendant claimed that he shot the man in self-defense. (*Ibid.*) At trial, the prosecution offered evidence of a prior incident in which the defendant pulled a gun on a drug dealer in his girlfriend's house. (*Id.* at pp. 128–129.) The defense argued that this prior incident was not relevant because the defendant was motivated, on that occasion, to help his girlfriend kick her drug habit and, in the instant case, the prosecution's theory was that the defendant killed the victim out of jealousy. (*Id.* at p. 130.)

The Court of Appeal agreed, finding that the earlier assault would only be relevant in the instant case if it had been committed with the same motive, i.e., jealousy. Because there was a dispute over the motive for that earlier assault, the trial court should have made a threshold evaluation of its admissibility and the jury should have been instructed that it had to find, as a preliminary fact, that the motive for the earlier assault was jealousy, before it could consider the prior offense under Evidence Code section 1101(b). (*Simon, supra,* 184 Cal.App.3d at pp. 129–132.)

▮ Here, unlike *Simon,* the 118 images of possible child pornography offered by the People are not relevant to the other charges in this case *only* if it were first proven that Garelick possessed those images with the specific intent or mental state to possess child pornography. Rather, the volume of material and the fact that those images were found in several different locations on Garelick's computer make them relevant to establish not only his knowledge of their existence on his computer, but also to establish the diminishing likelihood that the images' presence on his computer was inadvertent. (*People v. Robbins, supra,* 45 Cal.3d at p. 879.) Consequently, the trial court did not err by failing to instruct the jury that it must find as a preliminary fact that Garelick possessed or controlled the 118 images on his computer with the "specific intent or mental state" to commit the crime of possession of child pornography before it could consider that evidence under Evidence Code section 1101(b).

### B. *Any error in failing to modify CALCRIM No. 375 was harmless*

Even if the trial court should have instructed the jurors as defense counsel requested with respect to the 118 images offered pursuant to Evidence Code section 1101(b), it is not reasonably likely that Garelick would have received a more favorable outcome had they been so instructed. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1137 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Garelick's counsel conceded that Garelick had actual knowledge of the five images that were found on a folder located on the computer desktop, though

he argued that it was questionable whether the person in the images was under the age of 18. The images that were located in the "My Shared" file were there because Garelick utilized a peer-to-peer file sharing program, known as Kazaa, to search for images that fit certain criteria, and then selected certain images to download to his computer. The People's expert testified that because the images in those files had different access and creation dates associated with them, it was likely that Garelick had in fact opened and viewed the images at some point after they were downloaded.

In addition, the People's expert testified that the 40 images found in the Internet cache and the 49 images found in the drive's "free space" were all images that Garelick had likely viewed, either when he visited a Web page which included those images or when he downloaded and subsequently "deleted" the images.

There was ample evidence to establish Garelick had sought out and viewed the 118 images found on his computer, either because he had searched for and downloaded them from another computer, or because the images were automatically downloaded to his computer from the Internet when he accessed certain Web pages. We are convinced there is no reasonable probability the jury would have returned with verdicts more favorable to Garelick had it been instructed as defense counsel requested.

In addition, Garelick's guilt was established by means independent of the "other acts" evidence. The content of Garelick's online chat with "Suzzi" demonstrated his sexual interest in her, even after "Suzzi" told him she was only 13. When arrested at the park where he had arranged to meet "Suzzi," Garelick had in his pants pocket a package of the specific brand of condoms "Suzzi" requested that he bring to the park that night. In Garelick's car, there was a pack of the same flavor and brand of gum that "Suzzi" had asked for, along with handwritten directions to the park.

 C. *The trial court did not err either in issuing CALCRIM No. 220 or in failing to modify that instruction as requested*

Garelick argues that CALCRIM No. 220 impermissibly shifts the burden of proof to the defense by requiring the jury to "compare" the evidence "received" at trial. This language allowed the jury to hold against Garelick his failure to present evidence on his behalf, and precluded the jury from considering the lack of evidence presented against him by the People.

 1. *Burden of proof*

A number of recent cases have rejected claims that CALCRIM No. 220 is an unconstitutional instruction. (See, e.g., *People v. Hernández Ríos* (2007)

151 Cal.App.4th 1154 [60 Cal.Rptr.3d 591] (*Hernández Ríos*); *People v. Westbrooks* (2007) 151 Cal.App.4th 1500 [61 Cal.Rptr.3d 138] (*Westbrooks*); *People v. Flores* (2007) 153 Cal.App.4th 1088 [63 Cal.Rptr.3d 694] (*Flores*).)

In *Hernández Ríos*, the court considered essentially the same argument as Garelick raises here. The court noted that CALJIC No. 2.90 contained similar language referring to the "comparison and consideration of all the evidence," and had been approved by the United States Supreme Court in *Victor v. Nebraska* (1994) 511 U.S. 1, 16–17 [127 L.Ed.2d 583, 114 S.Ct. 1239]. (*Hernández Ríos, supra*, 151 Cal.App.4th at p. 1157.) As *Hernández Ríos* explained, "CALCRIM No. 220 uses *verbs* requiring the jury to 'compare and consider all the evidence that was received throughout the entire trial.' CALJIC No. 2.90 uses *nouns* requiring 'the entire comparison and consideration of all the evidence' by the jury." (*Ibid.*) The *Hernández Ríos* court concluded that, like CALJIC No. 2.90, the challenged language of CALCRIM No. 220 serves to inform the jury that its decision must be based on the evidence, and it rejected the defendant's claim that the instruction shifted the burden of proof. (*Hernández Ríos, supra*, at p. 1157.)

Garelick objects that CALCRIM No. 220 tells the jury it "must" compare the evidence "that was received throughout the entire trial," which not only suggests that the defendant has a duty to produce evidence to be "received" and compared by the jury, but it also precluded the jury from considering the *lack* of evidence.

In *Westbrooks*, the court rejected the contention that CALCRIM No. 220 prohibited the jury from considering the lack of physical evidence implicating the defendant in the crime in determining his guilt. The court held the sentence in question "merely instructs the jury that it must consider only the evidence presented at trial in determining whether the People have met their burden of proof. In other words, this instruction informs the jury that the People may not meet their burden of proof based on evidence other than that offered at trial." (*Westbrooks, supra*, 151 Cal.App.4th at p. 1509.) The court determined it would not have been reasonable for the jury to interpret CALCRIM No. 220 as stating the jury was precluded from considering any perceived lack of evidence in determining the accused's guilt. (*Westbrooks, supra*, 151 Cal.App.4th at p. 1510.)

Similarly, in *Flores*, analyzing the language at issue in CALCRIM No. 220, read together with CALCRIM No. 222, the court said that "[n]othing about the instructions given implies to the jury that the defendant must adduce evidence that promotes reasonable doubt or that the defendant must persuade the jury of his or her innocence by evidence presented at trial." (*Flores, supra*, 153 Cal.App.4th at p. 1093.)

We agree with the analyses of *Westbrooks*, *Hernández Ríos*, and *Flores*, and hold that because there is no reasonable likelihood that the jury understood CALCRIM No. 220 in the manner suggested by Garelick, the trial court did not err in giving such instruction to the jury.

### 2. *Abiding conviction*

Garelick also argues that the trial court violated his due process rights by failing to define the phrase "abiding conviction" in CALCRIM No. 220. There is no merit to this contention.

■ The definition of "reasonable doubt" in CALCRIM No. 220 is derived from section 1096 which, when given, requires "no further instruction . . . defining reasonable doubt . . . ." (§ 1096a.) The California Supreme Court has rejected similar challenges to the "abiding conviction" language as used in CALJIC No. 2.90, the predecessor to CALCRIM No. 220. (*People v. Cook* (2006) 39 Cal.4th 566, 601 [47 Cal.Rptr.3d 22, 139 P.3d 492]; see also *People v. Freeman* (1994) 8 Cal.4th 450, 501–505, 506 [34 Cal.Rptr.2d 558, 882 P.2d 249] [proper to use "abiding conviction" to define "beyond a reasonable doubt"].) The Courts of Appeal in every appellate district, including this one, have consistently rejected challenges to the definition of "reasonable doubt" set forth in section 1096, and as embodied (formerly) in CALJIC No. 2.90 and (now) in CALCRIM No. 220. (See *People v. Hearon* (1999) 72 Cal.App.4th 1285, 1286–1287 [85 Cal.Rptr.2d 424] [listing decisions from each appellate district rejecting challenges to reasonable doubt definition].) As the court in *Hearon* noted, "[t]he time has come for appellate attorneys to take this frivolous contention off their menus." (*Id.* at p. 1287.)

### D. *Garelick's constitutional challenges to section 288.2(b)[6] fail*

Garelick contends his two convictions for attempting to send harmful matter over the Internet must be reversed because section 288.2(b) on its face violates the commerce clause (U.S. Const., art. I, § 8, cl. 3) and the First Amendment right of free speech.

---

[6] Section 288.2(b), provides, in relevant part, "Every person who, with knowledge that a person is a minor, knowingly distributes, sends, causes to be sent, exhibits, or offers to distribute or exhibit by electronic mail, the Internet . . . or a commercial online service, any harmful matter, as defined in Section 313, to a minor with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of a minor, and with the intent, or for the purpose of seducing a minor, is guilty of a public offense and shall be punished by imprisonment in the state prison or in a county jail."

Section 313, subdivision (a) provides, " 'Harmful matter' means matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

■ In addressing a facial challenge to the constitutional validity of a statute or ordinance, we consider "only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; see *Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 193 [94 Cal.Rptr.2d 453] (*Hatch*).)

However, an exception to the limited scope of a facial challenge is applicable when a petitioner claims a statute is overbroad, restricting speech protected under the First Amendment, and "the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech . . . ." (*Secretary of State of Md. v. J. H. Munson Co.* (1984) 467 U.S. 947, 967–968 [81 L.Ed.2d 786, 104 S.Ct. 2839]; see *Hatch, supra,* 80 Cal.App.4th at p. 193.)

### 1. *Section 288.2(b) does not violate the commerce clause*

■ Article I of the United States Constitution grants Congress the power to regulate commerce among the several states. (U.S. Const., art. I, § 8, cl. 3.) When a state imposes a regulation that unduly burdens interstate commerce and impedes free trade, it may violate the commerce clause. (*People v. Hsu* (2000) 82 Cal.App.4th 976, 983 [99 Cal.Rptr.2d 184] (*Hsu*).)

Relying on *American Libraries Ass'n v. Pataki* (S.D.N.Y. 1997) 969 F.Supp. 160 (*Pataki*), Garelick claims that section 288.2(b) violates the commerce clause because (1) it regulates lawful conduct beyond California's borders; (2) its burden on interstate commerce outweighs its protective benefit; and (3) it subjects the Internet to inconsistent state regulations. We disagree.

At issue in *Pataki* was a New York statute that, much like section 288.2(b), proscribed using a computer to disseminate obscene material to a minor. (*Pataki, supra,* 969 F.Supp. at p. 163.) The *Pataki* court found that the statute applied to interstate communication because the statute did not limit its application to communications that took place entirely within the state. (*Id.* at pp. 169–172.) The court opined that the New York statute had the effect of exporting the State of New York's public policy to other states because the

nature of the Internet makes it impossible to restrict the statute's effects to conduct occurring entirely within the state. (*Id.* at p. 177.) The court further found the burden on interstate commerce exceeded any local benefit of the law. (*Id.* at pp. 177–181.) Finally, the court concluded the nature of the Internet "requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations" regarding the kind of material that may be disseminated through the medium. (*Id.* at p. 182.) As a consequence, the court concluded that the New York statute violated the commerce clause. (*Pataki, supra,* 969 F.Supp. at p. 183.)

■ The rationale of *Pataki,* however, has been rejected in *Hsu, supra,* 82 Cal.App.4th 976, and *Hatch, supra,* 80 Cal.App.4th 170.[7] Both *Hsu* and *Hatch* noted that section 288.2(b) differs materially from the New York statute at issue in *Pataki* since section 288.2(b) requires the offender to communicate harmful matter to a known minor *with the intent to seduce the minor,* and this requirement greatly narrows the scope of the law and its concomitant effect on interstate commerce. (*Hatch, supra,* 80 Cal.App.4th at pp. 194–196; *Hsu, supra,* 82 Cal.App.4th at pp. 984–985.) The *Hatch* court explained that "[w]hile a ban on the simple *communication* of certain materials may interfere with an adult's legitimate rights, a ban on communication of specified matter to a minor *for purposes of seduction* can only affect the rights of the very narrow class of adults who intend to engage in sex with minors. We have found no case which gives such intentions or the communications employed in realizing them protection under the dormant commerce clause." (*Hatch, supra,* 80 Cal.App.4th at p. 195.) On the contrary, as another New York court observed, "[W]e cannot conceive of any legitimate commerce involving the sending of graphic images to minors while at the same time attempting to lure them into engaging in sexual activity." (*People v. Foley* (1999) 257 A.D.2d 243, 253 [692 N.Y.S.2d 248].)

■ In addition, the *Hatch* majority found that *Pataki*'s concern regarding cohesive regulations was inapplicable to section 288.2(b) because of the statute's narrow scope. In *Pataki,* the court reasoned that "an Internet user cannot foreclose access to her work from certain states or send differing versions of her communication to different jurisdictions"; thus, the court concluded the need for uniformity of regulation required a finding that the law ran afoul of the commerce clause. (*Pataki, supra,* 969 F.Supp. at p. 183.) However, as the majority in *Hatch* explained, section 288.2(b) does not "criminalize 'access,' or require 'differing versions of . . . communication [in] different jurisdictions' (*Pataki, supra,* 969 F.Supp. at p. 183); it instead

---

[7] *Hsu* was a unanimous decision; in *Hatch,* the result was unanimous, but Justice McDonald dissented from the majority's conclusion that section 288.2 was constitutional. (*Hatch, supra,* 80 Cal.App.4th at pp. 205–228 (conc. & dis. opn. of McDonald, J.).)

proscribes communicating defined matter to a minor for purposes of seduction." (*Hatch, supra,* 80 Cal.App.4th at pp. 194–195.) Consequently, the underlying assumption in *Pataki* is irrelevant to section 288.2(b), and the majority declined to follow it. (*Hatch, supra,* 80 Cal.App.4th at p. 195.)

 Furthermore, the statute does not regulate behavior occurring wholly outside California. As *Hatch* explained, section 288.2(b), in the context of the Penal Code as a whole, only penalizes acts that occur *within* the state. (*Hatch, supra,* 80 Cal.App.4th at pp. 196–197.) California law generally bars punishment for wholly extraterritorial offenses, and there is no reason "to assume California prosecutors will attempt to stifle interstate commerce by filing charges for acts committed in other jurisdictions, or where only 'de minimis' acts [citation], such as those hypothesized in *Pataki,* are committed within this state." (*Id.* at p. 197; see *Hsu, supra,* 82 Cal.App.4th at p. 985 ["section 288.2, subdivision (b) cannot be enforced beyond what is jurisdictionally allowed"]; *Ferguson v. Friendfinders, Inc.* (2002) 94 Cal.App.4th 1255, 1264–1269 [115 Cal.Rptr.2d 258] [rejecting *Pataki,* agreeing with *Hatch* and *Hsu,* and concluding that statute that regulates the sending of unsolicited e-mail advertisements did not violate the commerce clause].)

 Garelick fails to convince us that *Hatch* and *Hsu* were wrongly decided. Moreover, we agree with those cases, find that the *Pataki* analysis does not apply to section 288.2(b), and conclude that the statute does not place an undue burden on interstate commerce in violation of the commerce clause.

### 2. *Section 288.2(b) does not violate the First Amendment*

Garelick also claims that section 288.2(b) is unconstitutionally overbroad because it is a content-based statute that burdens a substantial amount of protected speech, specifically, legitimate sexual speech directed at individuals under 18 who reside in states with lower ages of consent and who are therefore legally entitled to receive such communications. Like his commerce clause challenge, Garelick's First Amendment argument was also rejected in *Hatch* and *Hsu.*

 In *Hatch, supra,* 80 Cal.App.4th 170, the majority likened section 288.2(b) to statutes that properly restrict aggressive soliciting. The majority explained that the statute "punishes those who seek not discourse, but intercourse and other sexual *activity,* and who have identified intended victims for pursuit and seduction." (*Hatch, supra,* 80 Cal.App.4th at p. 201.) Thus, because section 288.2(b) applies to the dissemination of specifically

defined "harmful matter" *only* where the sender knows the recipient is a minor and sends the material with the specific intent to seduce the minor, the court found that the statute primarily regulates conduct, not speech, and thus does not violate the First Amendment. (*Hatch, supra,* 80 Cal.App.4th at pp. 203–204.)

The majority in *Hatch* further reasoned that section 288.2(b)'s knowledge and intent requirements so narrowed the statute's applicable scope that it would not have a chilling effect on nonspecific communications in general Internet forums. "While one might argue that . . . adults are free to address indecencies to an Internet audience while indifferent to the presence of children in that audience, it is only when the focus has shifted to the use of such communicated indecency in the attempted seduction of a child, a process we apprehend will be accomplished by direct, one-to-one communication that the present statute's prohibitions are violated. Thus, the only chilling effect of section 288.2 *is on pedophiles who intend that their statements will be acted upon by children. Given the intention with which they are made, such statements are not entitled to the extraordinary protection of the First Amendment.*" (*Hatch, supra,* 80 Cal.App.4th at p. 203.)

Garelick argues that *Hatch* wrongly concluded that the statute regulated conduct and not speech.

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 643 [129 L.Ed.2d 497, 114 S.Ct. 2445].) A content-based regulation is presumptively invalid. (*R. A. V. v. St. Paul* (1992) 505 U.S. 377, 382 [120 L.Ed.2d 305, 112 S.Ct. 2538].) It may be upheld under the strict scrutiny test only upon a showing that it is necessary to serve a compelling state interest and has been narrowly tailored to serve that end. (*Frisby v. Schultz* (1988) 487 U.S. 474, 481 [101 L.Ed.2d 420, 108 S.Ct. 2495].)

In *Hsu, supra,* 82 Cal.App.4th at page 988, footnote 8, the court disagreed with the *Hatch* majority on whether or not section 288.2(b) was a content-based regulation of speech. The court explained that "[t]he overriding aim of the regulation is to prevent a particular kind of message, i.e., harmful matter, from reaching minors in order to provoke in them a particular reaction, i.e., arousal of sexual desire." (*Hsu, supra,* 82 Cal.App.4th at p. 987.) Since that purpose cannot be served without referring to the speech the statute seeks to restrict, and the content of that speech was a threshold element of the offense, the *Hsu* court found section 288.2(b) constituted a content-based regulation on speech. (*Hsu, supra,* 82 Cal.App.4th at pp. 987–988.)

Nevertheless, the *Hsu* court agreed with the *Hatch* majority's conclusion that section 288.2(b) was not impermissibly overbroad and found that the statute passed the strict scrutiny test. As to the first requirement, the appellant in *Hsu* conceded that section 288.2(b) serves the compelling interest of protecting children from harmful material. (*Hsu*, *supra*, 82 Cal.App.4th at p. 988.) Moreover, the court noted that the statute was one of many specifically designed to " 'protect[] minors from sexual exploitation and predation.' " (*Id.* at pp. 988–989; see *Sable Communications of Cal., Inc. v. FCC* (1989) 492 U.S. 115, 126 [106 L.Ed.2d 93, 109 S.Ct. 2829] [state has compelling interest in protecting minors from material not obscene by adult standards]; *Ginsberg v. New York* (1968) 390 U.S. 629, 639–640 [20 L.Ed.2d 195, 88 S.Ct. 1274] [same].)

Concerning whether section 288.2(b) is narrowly tailored to serve that compelling interest, the court found that it employed the least restrictive means to achieve its purpose. The court noted that section 288.2(b) proscribed only the transmission of harmful matter to a known minor with the intent to sexually arouse and seduce the minor. Thus, "[t]he only chilling effect of the statute is on the conduct of those who would use otherwise protected speech to seduce minors. There is no violation of section 288.2, subdivision (b) when an adult disseminates the matter to another adult or to a minor without the intent of seducing the minor recipient." (*Hsu*, *supra*, 82 Cal.App.4th at p. 989.) The court further noted that "the statute's built-in affirmative defenses further limit its reach so that it targets only those who prey on minors to seduce them. It provides that parents or guardians who transmit the statutorily defined 'harmful material' to aid legitimate sex education, or other adults who transmit the material to aid scientific or educational purposes, shall have a defense against prosecution, and it relieves the Internet providers who transmit the material from prosecution entirely. (§ 288.2, subds. (c), (d), (e).)" (*Ibid.*)

Finally, the court pointed out that the scope of the statute was further narrowed by the statutory definition of "harmful matter," under which harmful matter is gauged by only contemporary *California* standards. (*Hsu*, *supra*, 82 Cal.App.4th at p. 991; § 313, subd. (a); compare with *American Civil Liberties Union v. Reno* (3d Cir. 2000) 217 F.3d 162 [finding it likely the Child Online Protection Act (Pub.L. No. 105-277 (Oct. 21, 1998) 112 Stat. 2681) would be deemed overbroad because the definition of harmful material was too broad].)

 We agree with the analysis in *Hsu* that section 288.2(b) is sufficiently tailored to serve a compelling state interest and is therefore constitutional.

III. *Disposition*

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 2008, S163670.