Filed 2/22/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ANGELO LENA,<br><br>        Defendant and Appellant. | A138474<br><br>(Marin County<br>Super. Ct. No. SC106831A) |

Appellant Michael Angelo Lena was convicted of two counts of assault with a semiautomatic firearm upon a peace officer (Pen. Code, § 245, subdivision (d)(2)), residential burglary (Pen. Code, § 459), and possession of a firearm by a felon (Pen. Code, § 12021, subdivision (a)), for which, with enhancements and prior convictions, he received a sentence of 51 years in state prison. He now appeals, arguing it was error to sanction him for refusing to answer questions on cross-examination by striking his entire testimony, and to admit evidence of various uncharged burglaries under Evidence Code section 1101, subdivision (b) to show intent, motive and common plan. We affirm, addressing the issue of sanctions for refusal to submit to cross-examination in part II.A of this opinion, which is published, and the Evidence Code section 1101, subdivision (b) issue in part II.B of the opinion, which is unpublished.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

# I.    BACKGROUND

On February 17, 1999, police officers responded to a reported home burglary alarm going off in Corte Madera at what was later identified as the Ryborg/Fellows home.  The officers encountered Lena in the neighborhood, where at least one home had recently been broken into.  Lena, sporting fresh mud on his trousers, got into his car and drove away.  The officers found the mud suspicious because it had rained that day and the Ryborg/Fellows home was near a wooded hillside thick with mud from the rain.  They therefore followed Lena's car for a short distance and then tried to make a traffic stop.  Lena attempted to escape, but cornered himself on a dead-end street, where he jumped out of his car and pointed a gun at the pursuing officers.  One of the officers drew his own gun in defense, which surprised Lena, and he fled the scene on foot down a bike path.  Unable to catch him, the officers searched Lena's vehicle and discovered an arsenal of firearms that had been stolen in four different burglaries from various locations throughout the Bay Area within a period of less than two years, and a number of stolen passports, one of which had just been taken from Werner Maassen's house, also in the Ryborg/Fellows neighborhood, a short time earlier in the day. The rest of the passports also bore an address in the same neighborhood.  When Maassen returned home from work that afternoon, he confirmed that his home had been burglarized and ransacked and his passport stolen.  It was the Maassen burglary for which Lena was ultimately prosecuted and convicted in this case.

After his escape from the officers, Lena fled north by truck, avoiding capture, and made it all the way to the Canadian border.  But as he attempted to cross the border control point, he behaved suspiciously, and the Royal Canadian Mounted Police tried to apprehend him.  The result was a high-speed chase into Canada that ended abruptly with a roadblock and a shootout with the pursuing Canadian officers.  Lena was wounded, taken into custody, and after a brief stint in the hospital, convicted and imprisoned in Canada for discharging a firearm at a person and attempted murder.  After serving his sentence, Lena was brought back to California to be tried for the offenses that led to his flight into Canada.

## II.    DISCUSSION

### A.    *Striking of Lena's Testimony*

We first address Lena's argument that the trial court erred in striking his testimony, a claimed error which he says deprived him of an adequate defense. Lena contends the striking of his entire testimony was an abuse of the trial court's discretion because the trial court failed to consider less severe alternatives and should have imposed a lesser sanction. We disagree.

### 1.    *Lena's Testimony and Conduct at Trial*

At trial, Lena chose to represent himself. He based his case primarily on his own testimony, the sum and substance of which was significantly different from what had been reported by California and Canadian police. Lena claimed he was delivering medicine to a friend in Corte Madera when he was pulled over by police officers for no apparent reason. He denied burglarizing any homes, claiming the stolen passports and firearms found in his car had been planted there by both California and Canadian officers sometime during the years he spent in Canadian prison.

Lena claimed he never pointed a gun at pursuing officers in California, and that he fled because he feared the officers were actually federal agents who had been following him for a few years. The only reason he sought refuge in Canada, Lena explained, was because, upon escaping the officers in Marin County, he saw his face plastered across the news as a burglary suspect, and he felt it was in his best interest to flee the country even though he was innocent.

Lena also claimed he passed though the Canadian border without incident, but the Canadian police put up a barricade further down the road in order to stop him. According to Lena, after he crashed into a ditch, Canadian officers snuck up and shot him twice from behind, causing severe wounds which put him in the hospital. He never fired back, he claimed, because he had no gun; he said the firearms the Canadian officers found in his truck, like the guns found in his car in the U.S., were plants used to frame him.

After giving his testimony, Lena told the court and the jury he would not answer any of the People's questions during cross-examination. The court cautioned him against

3

that course, explaining that if he refused to answer appropriate questions during cross-examination, his entire testimony would be stricken from the record. That did not deter Lena, and he replied it would not matter if his testimony was stricken because the jurors wouldn't be able to "delete [his testimony] from their memory."

During cross-examination, Lena held true to his threat and refused to answer any questions. He told the jury he was doing so because he believed the People had "stonewall[ed]" him, and he thought it only fitting to do the same thing to them. Again the court tried to warn Lena it would strike his testimony from the record if he continued acting belligerently, but he was undeterred. In light of his refusal, the court struck his entire testimony.

2.     *The Striking of Lena's Testimony Was Not an Abuse of Discretion*

A defendant is entitled to a fair opportunity to defend against the State's accusations, which includes the right to give testimony on his own behalf at trial. (See *Chambers v. Mississippi* (1973) 410 U.S. 284, 294; see also *People v. Reynolds* (1984) 152 Cal.App.3d 42, 46 (*Reynolds*); *People v. Robles* (1970) 2 Cal.3d 205, 214-215.) If a defendant chooses to exercise that right, the People may cross-examine him to test his credibility or otherwise refute his statements. A defendant does not have the right to present facts favorable to his case without subjecting himself to cross-examination on those facts. (*People v. Harris* (1981) 28 Cal.3d 935, 953; *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 736.)

Courts have long recognized that when a defendant refuses to submit to cross-examination, a trial court may, in its discretion, impose sanctions. (*People v. Robinson* (1961) 196 Cal.App.2d 384, 390.) The standard governing what sanction is appropriate may be stated, generally, tracking Wigmore's summary of the rule, as follows: " 'Where the witness, after his examination in chief on the stand, has *refused* to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed, and his direct testimony should be struck out. *On the circumstances of the case, the refusal or evasion of answers to one or more questions only need not lead to this result.* [Emphasis added.] . . . [¶] Courts treat this situation with varying degrees of

4

strictness. It should be left to the determination of the trial judge, regard being had chiefly to the motive of the witness and the materiality of the answer.' (5 Wigmore, Evidence [3d Ed.] p. 112.)" (*Ibid.*)

Lena relies on *Reynolds, supra,* 152 Cal.App.3d at pages 47–48, a case, like this one, in which the defendant refused to answer questions on cross-examination after testifying in his defense, and the trial court, as here, struck his entire testimony. (*Id.* at p. 45.) The imposition of that remedy was affirmed on appeal. (*Id.* at p. 47.) In the course of its analysis, the appellate court set forth some guidelines for the exercise of discretion in situations where a trial court is confronted with a defendant who refuses to submit to cross-examination. Because striking a defendant's entire testimony is so drastic, the *Reynolds* panel explained, trial courts should first consider a less severe form of sanction such as instructing the jury to take the defendant's refusal to answer questions into account in assessing his credibility or partially striking his testimony. (*Id.* at pp. 47–48.)

*Reynolds* was a case in which defendant only refused to answer a few specific questions on cross-examination. The questions concerned the identity of a crime partner, and the reason the defendant gave for his unwillingness to answer was fear of retaliation. Even so, his refusal made effective cross-examination "extremely difficult, if not impossible" because the questions went to the core of his testimony. (*Reynolds, supra,* 152 Cal.App.3d at p. 47.) Because the prosecution's ability to cross-examine was materially hindered, the court reasoned, striking the entirety of his testimony was the only appropriate sanction in that situation. (*Ibid.*)

If anything, the record here provides much stronger support for the striking of testimony in toto than did the record found to be sufficient in *Reynolds*. While the defendant in *Reynolds* had a rational, if ultimately unacceptable, basis for refusing to answer questions put to him on cross examination, Lena tried to justify his defiance as retaliation for unspecified "stonewalling" by the prosecution , a problem which, had it been real, he should have dealt with by objection when it arose, not by obstructing his

5

own cross-examination. Unlike the defendant in *Reynolds*, moreover, Lena refused to answer any questions at all, even basic questions about identifying information.

It is evident from the record that the trial court appropriately took into account Lena's motive for refusing to submit to cross-examination and considered the degree of hindrance to the prosecution. It is also evident that the trial court took a deliberate, measured approach, first giving Lena multiple warnings before deciding to strike his testimony. Quite obviously, the lesser sanction of partially striking his testimony was not appropriate, because Lena's categorical refusal to submit to any cross examination did not allow the parsing of his testimony by subject matter. Given Lena's absolutist stance and the frivolous rationale he gave for taking it, the court was well within its discretion to conclude that a lesser sanction was not commensurate with the injury to the truth-seeking process that Lena had inflicted.

Lena insists the court had an obligation to impose the least drastic option. For this argument, he offers a misreading of *Reynolds*. *Reynolds* does not announce, as Lena suggests it does, that the proper sanction *must be* the least drastic option available; it merely states that a court should consider imposing less drastic alternatives before choosing a greater sanction. (*Reynolds*, *supra*, 152 Cal.App.3d at pp. 47–48.) Here, although the court did not make an express finding that the lesser sanction of instructing the jury to take Lena's refusal to answer cross-examination questions into account in assessing his credibility, we imply that finding. The panel in *Reynolds* pointed out that a less drastic option had been available, but—without an express finding from the trial court on the point—still affirmed the striking of the defendant's entire testimony because a lesser sanction would have been inappropriate. (*Id.* at p. 47.) The same is true here.

**B.** *Admissibility of Uncharged Burglaries*

We next address whether it was an abuse of discretion to admit evidence of five uncharged burglaries to prove Lena's intent, motive, and common plan in committing the charged Maassen burglary. Lena appeals on two grounds. First, he argues it was an abuse of discretion to admit the burglaries under Evidence Code section 1101, subdivision (b), because there was insufficient evidence to show he was their

perpetrator, as a preliminary fact. Second, he argues it was an abuse of discretion not to exclude the burglaries under Evidence Code section 352 and a violation of due process because the uncharged burglaries were so dissimilar to the charged burglary that they had little probative value to outweigh the prejudicial effect on the jury.

We conclude the trial court properly determined there was substantial evidence of Lena's connection to the uncharged burglaries as a preliminary fact. We further conclude we do not need to address the merits of Lena's Evidence Code section 352 claim because he waived that challenge on appeal, and any potential error was harmless.

1. *The Uncharged Burglaries*

After Lena's encounters with police officers in Corte Madera and Canada, the officers in both countries discovered stolen firearms, passports, and jewelry in his vehicles, all of which had been stolen in five different burglaries of affluent homes throughout the Bay Area within twenty-one months of his capture.

The first, the Collins burglary, took place May 17, 1997 in Mill Valley. The Collins house, which sits on a secluded hillside, had been entered into through an unlocked back window and ransacked sometime during the day. A Beretta 7.65 semi-automatic firearm had been taken, which was discovered by officers in Lena's car in Corte Madera after the charged burglary in February 1999, as well as a Taurus nine millimeter semi-automatic firearm which was found in Lena's truck in Canada a few days later.

The second, the Cone burglary, took place July 3, 1998 in San Carlos, in San Mateo County. Like the Collins house, the Cone house is secluded, multi-leveled, and sits on a hillside. The burglar had entered the house through an unlocked back door. Two guns were taken from the Cone house, one of which was a nine millimeter Glock semi-automatic firearm that was later found to be the gun Lena fired at Canadian officers in February 1999.

The third, the Hale burglary, took place October 29, 1998, in Walnut Creek. The Hale house is located on a narrow, winding road approximately three-quarters of a mile off the main road. Sheridan Hale is the only person who lives on this road. The burglary

7

took place in the evening, but like the Collins house, the means of entry was also through a rear window whose screen had been removed.  The Hale house was not thoroughly searched like the Cone or Collins houses, but Hale had left the stolen item—a model 5906 nine millimeter Smith and Wesson semi-automatic handgun—sitting on his bed.  The stolen firearm was found in February 1999 in Lena's car in California.

The fourth, the Trembly burglary, occurred in San Bruno, also in San Mateo County, on November 1, 1998.  Matthew Trembly reported that he had returned to his house to find his garage door opened on several occasions just before the burglary of the garage took place.  The item stolen by the burglar was a Smith and Wesson semi-automatic .45 handgun, which Trembly had left in a canvas bag hanging on his work bench.  This firearm was later found in Lena's truck in Canada in February 1999.

The fifth, a burglary committed in the Lake house in Corte Madera, occurred February 14, 1999, just three days before the Maassen burglary.  Sometime during the afternoon, the burglar smashed open the Lakes' sliding glass back door to gain entry.  The Lakes' spare bedroom had been completely ransacked, from which jewelry and the family's passports had been stolen, which were found in Lena's car by Corte Madera officers three days later, and they also discovered muddy footprints in their upstairs bedroom.  The Lake house, like the previous four houses, also had secluded means of access:  A small, public-access jogging path directly behind the house.

The charged Maassen burglary took place on February 17, 1999 in Corte Madera, not far from the Lake house.  The Maassen house sits on an incline, and the backyard is steep and wooded.  The burglar forced open and entered through the rear window of the downstairs master bedroom during the daytime, like the Collins and Hale burglaries.  Maassen's house had been significantly searched—containers in the bedroom, hallway, closet, library, and upstairs living room had all been rifled through.  Like the Lake house, the item stolen from the Maassen house was a passport, which also was found in Lena's car in California on the same day.

## 2. *The Court's Ruling on Admissibility*

From the outset of the case, in his various filings and court appearances, Lena consistently denied committing the Maassen burglary, or any burglary, and similarly denied even having possessed the items found in his vehicles. He also claimed that California officers, Canadian officers, and the prosecutor had planted the evidence when he was in Canadian prison.

To refute Lena's denials, the People filed a motion in limine in August 2012 seeking admission of testimony by the victims of the five uncharged burglaries[1] to prove Lena's intent, motive, and identity in the charged Maassen burglary. A few days after the People filed the in limine motion, Lena filed a motion in opposition (which he titled a "[m]otion to strike/dismiss"). Lena asserted the People were lying about the evidence, the items allegedly found in his vehicles were "planted," and they had convinced the victims to lie for them.

In the course of the proceedings, the court, exhibiting admirable patience, attempted to work through the backlog of over 2,000 motions Lena had filed, most of which were denied for failing to provide legal bases. On September 12, 2012, while the court was addressing several of Lena's filed motions, Lena expressed a sudden desire to go directly to trial and withdrew every single motion the court had yet to rule upon, including his motion related to the uncharged burglaries. The court construed this as

---

[1] The People also introduced evidence of two other uncharged crimes in addition to the five uncharged burglaries: the break-ins at the Ryborg/Fellows and Immerman residences. While nothing was taken from either home, these crimes were relevant to the People's case because they were committed on the same day, in the same city, and on the same street (indeed, the Immerman home is just up the hill) as the charged burglary of the Maassen home. The break-ins also feature similar circumstances to the Maassen burglary, such as rear entry, secluded location, and easy access to side roads. Furthermore, the Immerman house was entered through a sliding glass backdoor, which, like in the Lake burglary, had been shattered, and the house had been ransacked. Lena's counsel does not question the admissibility of the Ryborg/Fellows or Immerman break-ins, only the five uncharged burglaries.

Lena asserting his right to a speedy trial, and the trial was ultimately set to start on October 22, 2012.

The court considered the in limine motion at issue here on October 15, 2012. At that time, Lena initially reiterated his theory that the evidence linking him to the uncharged burglaries had somehow been planted in his vehicle by law enforcement or was supported only by perjured testimony. After such vehement denials, Lena, without waiting for a ruling from the court, said that if the evidence "comes in anyway" he was "just gonna use it in [his] defense." At no time did he state any specific objection to the evidence, and he never requested a hearing under Evidence Code section 403 to establish preliminary facts necessary to the admissibility of the other burglaries.

Due to the similarities in the various burglaries—and especially the fact that all of the stolen items were found in Lena's car and truck—the trial court ruled the evidence was admissible for the purpose of intent, and said it would also consider admitting it for identity, motive, common plan, and the other issues identified in Evidence Code section 1101, subdivision (b). Lena then changed his tack and, instead of arguing against admission of the uncharged crimes, said, "I say let it all in." After Lena confirmed he wanted evidence of all the uncharged burglaries to come in, the court asked him if he wanted them limited to the categories discussed, or if he also agreed to have them admitted for the purpose of establishing identity. Lena stated he "totally object[ed]" to having them admitted for identity, arguing that "there is absolutely no evidence whatsoever that I did any of them." In response, the court ruled that it would not allow them in for purposes of identity. Lena confirmed with the court that he would be permitted to use the "evidence that they planted from those burglaries" to support his own theory of the case.

3. *Lena's Connection to the Uncharged Burglaries Was Established as a Preliminary Fact*

Evidence of a defendant's prior uncharged crimes can be admitted under Evidence Code section 1101 subdivision (b) to prove intent, motive, and common plan. This evidence can only be introduced if the prosecution establishes, by a preponderance of the

evidence, that the defendant is connected to the crime.  (*People v. Carpenter* (1997) 15 Cal.4th 312, 380–382 (*Carpenter*).)  The defendant's connection to the crime is a preliminary factual issue that must be decided before the evidence can be admitted. (*People v. Lucas* (2014) 60 Cal.4th 153, 218; *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115; *People v. Simon* (1986) 184 Cal.App.3d 125, 129–131.)

For an uncharged offense to be admissible for the purpose of proving intent, only a sufficient similarity to support an inference that the defendant probably had the same intent in both instances is required.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)  To prove a common plan, the acts must, beyond simply having the same result, share common features which can be explained as the result of a general plan of which the charged crime was a part.  (*Ibid.*)  In this case, the uncharged burglaries supported an inference that Lena specialized in stealing passports and firearms.  That he had a collection of stolen guns, all stolen in Bay Area burglaries, suggested he knew they were stolen and increased the likelihood he was the burglar who stole them.  And, too, passports were stolen from the Lake home, near Maassen's, just days before the Maassen burglary.  The pattern of the uncharged burglaries tended to show he intended to steal Maassen's passport, his motive was to steal a passport, and that the Maassen burglary was one instance in an ongoing common plan to illegally acquire passports and firearms. It further suggests strongly that he knew about the guns found in his vehicles, thus supporting the felon in possession charge.  The evidence was relevant to the issues of intent, motive and common plan in the burglary charge and knowledge in the possession charge, and its admission was limited accordingly.  Finally, the trial court's warning to the prosecutor that she should avoid putting on cumulative evidence shows the court was willing to exclude some evidence under a prejudice versus probative value balancing analysis (Evid. Code, § 352) had it not been for Lena's insistence that the court "let it all in."  (See *People v. Leon* (2015) 61 Cal.4th 569, 599 (*Leon*); *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885.)  We see no abuse of discretion in the trial court's determination of relevance.

But according to Lena's analysis, the People were required to establish as a preliminary fact, before the evidence could be admitted (see Evid. Code, § 403), that he was the burglar in the uncharged crimes, and on that point he claims there was insufficient evidence to admit the other burglaries. Possession of recently stolen goods not only justifies an inference that the possessor received them knowing they were stolen, but also tends to show the possessor's guilt of the burglary of those items if the possessor fails to show that he received the items honestly. (*People v. MacFarland* (1962) 58 Cal.2d 748, 754.) Lena argues the burglaries were not recent enough to support an inference that he was the actual burglar, pointing out that the published cases generally applied that rule only where the possession was closer in time to the burglary, asserting the burglaries in this case occurred up to three or more years before he was found in possession of the stolen guns and passports. This is factually incorrect, because only one burglary preceded the charged offenses by more than one year, while the others preceded Lena's apprehension by only months.

More fundamentally, we disagree with Lena's analysis and believe the prosecutor's offer of proof that the stolen guns were found in Lena's vehicles was enough to show his "connection" to the burglaries. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 218; *People v. Garelick*, *supra*, 161 Cal.App.4th at p. 1115.) It was up to the jury to decide whether he was, in fact, the burglar (*Leon*, *supra*, 61 Cal.4th at p. 599) by a preponderance of the evidence (*Carpenter*, *supra*, 15 Cal.4th at pp. 380–382; *People v. Simon*, *supra*, 184 Cal.App.3d at pp. 132–134; *People v. Donnell* (1975) 52 Cal.App.3d 762, 777). Establishing defendant's "connection" to the burglaries did not require proof sufficient to sustain his conviction as the burglar. "The threshold admissibility of uncharged crimes evidence does not require proof that the defendant was the perpetrator in both sets of offenses. As [the Supreme Court] explained in *People v. Soper* (2009) 45 Cal.4th 759, 778, 'a fact finder properly may consider [section 1101, subdivision. (b)] evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citation], and further (2) . . . "the factual similarities . . . tend to demonstrate that in each instance the perpetrator harbored" the

12

requisite intent. [Citation.] There is no requirement that it must be conceded, or a court must be able to assume, that the defendant was the perpetrator in both sets of offenses.' " (*Leon*, at p. 599; accord, *People v. Rogers* (2013) 57 Cal.4th 296, 330–331; *People v. Foster* (2010) 50 Cal.4th 1301, 1332.)

Lena relies on cases dealing with sufficiency of the evidence to support a conviction, not cases discussing the showing required for admissibility (see *People* v. *MacFarland*, *supra*, 58 Cal.2d at pp. 752, 754; *People* v. *Vann* (1974) 12 Cal.3d 220, 224 [receiving stolen property]), thereby failing to recognize the difference between the two standards, as discussed in *Leon*, *supra*, 61 Cal.4th at page 599. His analysis is correspondingly flawed.

Moreover, the court's evidentiary ruling was based on the totality of the evidence, not merely the possession of the stolen goods. Although Lena claims the crimes are not similar, he does not address or refute the similarities the People identified and the court accepted. The court found the burglaries were all residential and mostly committed during the day, only one of which was committed during the early evening. All of the houses had multiple levels and were secluded in some way—either by relative location, or only accessible by trails, smaller lanes, or winding roads. Access into the houses was gained through the rear by breaking windows or through unlocked doors and most were ransacked. In each of the cases, large items, most jewelry, and computers or electronics were completely ignored in favor of taking passports and firearms. Only in one of the six total burglaries was jewelry taken, but unlike the others, the jewelry taken was small and in plain sight.

We agree with the People there was sufficient evidence to permit the burglaries to go to the jury because Lena's possession of their fruits showed a connection to the uncharged burglaries as a preliminary fact and there was sufficient similarity between the charged and uncharged burglaries for the jury to infer he was the burglar in each case. Thus, the uncharged crimes were relevant to prove intent, motive, and common plan in the charged burglary. We construe the court's summary of the similarities to be both a ruling on the motion in limine under section 1101, subdivision (b) and a preliminary fact-

13

finding of sufficient indicia of identity to allow the jury to find he was the burglar in the uncharged crimes by a preponderance of the evidence. (See *Carpenter*, *supra*, 15 Cal.4th at pp. 380–383; CALCRIM No. 375.)  The jury was instructed on the necessity of making this preliminary fact-finding.  The trial court's evidentiary ruling was not an abuse of discretion and must be upheld.

      4.      *Lena Forfeited His Challenge to the Admission of the Burglaries*

Lena now argues, for the first time, that evidence of the uncharged burglaries should have been excluded under Evidence Code section 352.  We need not address that issue on the merits because he forfeited it by failing to object on this ground in the trial court and by inviting admission of the evidence he now finds objectionable, fully aware when he did so that he might have grounds to object.  (Evid. Code, § 353.)

Although Lena claimed the uncharged crimes evidence was based on untruths, he took the position that all of the evidence should be admitted anyway.  The court suggested to the People that they consider limiting the evidence, otherwise Lena might have an objection, but Lena interrupted and demanded that all the evidence be admitted:

> "THE COURT: What I'm prepared to do, at this point, is the evidence of those burglaries may come in, including Trembly and Hale, however, what I am going to suggest to the People is that you think about the ones you want in most and put those in first because, at some point, Mr. Lena may have an argument that putting in more is cumulative and—"
>
> "THE DEFENDANT: No, no, no."
>
> "THE COURT: You want them all of them in? [*sic*]"
>
> "THE DEFENDANT: Yeah."

When the court attempted to make sense of Lena's contradictory statements and asked him whether he wanted to limit the admission in his favor, Lena only asked that the burglaries not be admitted to prove identity.  The court acceded to this limitation and so instructed the jury.  Beyond that, Lena wanted the evidence to be admitted carte blanche.  In light of this exchange, we conclude Lena clearly forfeited his right to raise on appeal

14

any Evidence Code section 352 objection to the admission of the uncharged crimes evidence.

Having chosen to represent himself, as he had a right to do, Lena's tactical choices as counsel for himself are no less binding on him than an attorney's choices would have been. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984–985; *Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.) Lena himself elected to have all of the uncharged burglaries come into evidence, despite the obvious potential for prejudice, expressing what must be regarded as a tactical reason. Even if his tactical maneuver was of questionable wisdom, he nevertheless was pursuing what he considered to be a strategic defense objective. Whether he was aware that his actions might bar a later challenge on appeal is irrelevant. A competent lawyer would have known that, and he is held to the same standard.

5.      *Any Error Committed Was Harmless*

Even if we were to decide that Lena did not waive his Evidence Code section 352 challenge, we still have no occasion to address the merits of the claim. It is immaterial whether the uncharged burglaries were improperly admitted because any resulting error was harmless.

Lena's defense to the charges against him in this case was based on wild, contradictory, paranoid claims that were at odds with objectively proved fact. He believed that a grand conspiracy between the prosecutor's office and law enforcement in California and in Canada had been orchestrated for the sole purpose of convicting him. His conspiracy theory involved items stolen from a number of Bay Area residences within a short time frame from one another, and he insisted those items had somehow fallen into the hands of California and Canadian officers, who then planted them in his vehicles after he was already in a Canadian prison. This testimony is even more improbable considering the items stolen from the Collins home were discovered in both of Lena's vehicles in California and Canada, either suggesting California officers split up the firearms and shipped some of them to Canada, or Canadian officers came down to California to retrieve a share of the firearms.

15

Even without the admission of the uncharged crimes, the evidence against Lena was overwhelming.  He did not contest it in any meaningful way, other than by offering a blanket denial couched in what was quite plainly delusionary confabulation.  With respect to the burglary count, he was caught in possession of the only item stolen in the Maassen burglary within a few hours, at most, of the burglary, before the burglar would have had a chance to dispose of the property.  He was also found in the possession of multiple firearms at the same time, and his awareness of their presence was amply demonstrated by the discovery of an additional cache of weapons in his truck in Canada.  To credit Lena's defense, the jurors would have had to disbelieve the testimony of virtually every other witness, including police officers from two different countries.  We conclude there was no reasonable probability the jury would have believed his far-fetched conspiracy theory, whether the uncharged burglaries were admitted or not.  This case was not close.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836–837.)

Lena further claims the admission of the uncharged burglaries violated his due process rights, and thus entitled him to review under the *Chapman* standard.  (*Chapman v. California* (1967) 386 U.S. 18.)  Generally speaking, of course, a violation of a state evidentiary rule is not a federal constitutional error.  (*People v. Benavides* (2005) 35 Cal.4th 69, 91.)  Even though in some instances an admission of evidence in violation of section 352 may amount to a due process violation (see *People v. Partida* (2005) 37 Cal.4th 428, 439), that is immaterial here because any such error was harmless even under the *Chapman* standard.  The People's evidence was so conclusive of Lena's guilt and Lena's defense was so weak that we conclude, beyond a reasonable doubt, the jury would have returned the same verdict even without the evidence of the uncharged burglaries.

## III.    DISPOSITION

The judgment is affirmed.

_____
Streeter, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

Trial Court:    Marin County Superior Court

Trial Judge:    Hon. James T. Chou

Counsel:

Mark David Greenberg under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Supervising Deputy Attorney General, Laurence K. Sullivan, Supervising Deputy Attorney General, Moona Nandi, Deputy Attorney General for Plaintiff and Respondent.