Filed 10/27/25  P. v. Garcia CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL GARCIA,<br><br>    Defendant and Appellant. | B336410<br><br>(Los Angeles County<br>Super. Ct. No. GA111873) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Villalobos, Judge.  Affirmed; sentence vacated and remanded.

Mary Jo Strnad, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Ana R. Duarte and Kenneth C. Byrne, Deputy Attorneys General for Plaintiff and Respondent.

———————————

The jury found Daniel Garcia guilty of assault by means likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4), count 1) and making a criminal threat (§ 422, subd. (a), count 2). Garcia was acquitted of assault with a deadly weapon. (§ 245, subd. (a)(1), count 3.) In a separate proceeding, the trial court found true the allegation that Garcia had suffered three prior serious or violent felony convictions within the meaning of the Three Strikes law. (§§ 667, subds. (b)-(d) & 1170.12, subds. (a)-(i).) The trial court sentenced Garcia to two concurrent terms of 25 years to life in prison.

On appeal, Garcia contends that the trial court abused its discretion by admitting evidence of a prior uncharged kidnapping. He further contends, and the People concede, that the trial court imposed an unauthorized sentence in count 1 when it sentenced him as a third-striker, because assault by means likely to produce great bodily injury is not a serious or violent felony.

We vacate the sentence and remand to the trial court for resentencing. In all other respects, we affirm the judgment.

---

[1] All further statutory references are to the Penal Code.

# FACTS

## A.  *Prosecution*

### 1.  Rosalind

On April 13, 2022, Garcia was living with his grandmother, Stella Rogers, and his mother, Rosalind G., in Rogers's home.  A neighbor knocked on the front door and asked Rosalind if he could speak with Garcia.  Rosalind walked to Garcia's room, where Garcia was talking on the telephone.  When she started to tell Garcia that the neighbor was at the door, Garcia held up his hand to silence her.  Rosalind told Garcia not to disrespect her.  Rosalind then told Rogers that it was time for Garcia to move out because she was tired of Garcia disrespecting them.

Garcia walked to the front door and slammed it shut without talking to the neighbor.  He got in Rogers's face and yelled something like " 'You have a conspiracy against me.' "  He continued shouting that Rosalind and Rogers were conspiring to kick him out of the house.  Rosalind observed Garcia "getting very violent the way he was talking to my mom[,]" so she grabbed her phone off the sofa and started calling the police.  Garcia took the phone from Rosalind's hand, slammed it to the ground, and stomped on it.  When Rosalind bent down to pick up her phone, she saw Garcia bouncing up and down in front of her.  He was moving like a boxer, as if he was trying to work himself up to hit her.  Garcia hit Rosalind in the head and face with a closed fist about four or five times.  Rosalind fell from the blows.  After she fell, Garcia continued to hit her from her shoulders all the way down her body.  He said, " 'I'm going to kill you, bitch.' "

3

Rosalind was scared. She believed Garcia was going to kill her because he did not stop punching her. Garcia had told Rosalind that he would injure other people by beating them from the head down the side of the body. Garcia said that this caused blood clots that could kill someone; he was hitting Rosalind in the way he had described. Rosalind knew that Garcia had a history of violence. He beat his wife and his girlfriends. One of his girlfriends brought all of Garcia's belongings to Rogers's house and said that she had enough of him because he was beating her up. Rosalind had also overheard her boss and coworkers saying that a young man in the neighborhood had been kidnapped by two other young men, who beat him up and kept him hostage for days. She later found out that Garcia was involved.

Rosalind got up, and Garcia punched her in the back, knocking her into a coffee table. Rosalind tried to get up again, but she could not because Garcia had pushed Rogers on top of her. Rosalind saw Garcia swinging a chair around. She told her mother to get up, but Rogers was unable to because she could not touch the floor. Rosalind pushed herself up and slid Rogers into an upright position. Rosalind then tried to run, but Garcia hit her in her hip with a chair. He threatened to kill her two more times. The second and third times that Garcia threatened to kill Rosalind, he called her a "fucking bitch."

Rosalind got up and ran into the kitchen. She knew that Garcia would catch her if she tried to escape, so she grabbed a couple of knives from a drawer. Rosalind told Garcia not to come near her again or she would hurt him. Garcia ignored Rosalind's warning and punched her in the arm, knocking her into a small table. Rosalind cut her hand on a metal basket that had been sitting on the table and one of the knives fell to the floor.

Rosalind got up, but Garcia did not leave. She stabbed Garcia with a small steak knife twice, once in the arm and once in the shoulder. Rosalind feared for her life. After she stabbed Garcia he stopped advancing. Garcia called Rosalind names. Then he grabbed his phone and said he was going to call the elders at Rosalind's church and tell them what she had done to him. Garcia sat down at the dining room table, called the church elders and told them that Rosalind had stabbed him. He did not tell them what he had done to provoke the stabbing.

The police arrived in five to ten minutes. Initially the police arrested Rosalind, but after about 20 minutes they released her and arrested Garcia. Rosalind had a cut on her hand and swelling, cuts, and scratches on her head and face. She went to the hospital the same day. They stitched up her hand and took X-rays. The doctor instructed Rosalind to return to the hospital immediately if she had any worrying symptoms.

Rosalind began having problems about a week later. She had sustained heavy bruising to her face, head, leg, back and shoulder areas. The bruising lasted for months. At the time of trial, Rosalind could not sleep on her left side where the bruising was concentrated. A few weeks after the incident, Rosalind started having trouble moving her left leg. One of her arms was "hanging, like somebody was pulling on it," and she could not speak normally. She was unable to hold a conversation.

After a few days, Rosalind went to the emergency room. She tried to get dressed that morning and fell. She had trouble getting control of her body. Rosalind drove herself to the hospital, where she lost consciousness. She was there half a day before they transferred her to a second hospital where she stayed for about a week. Rosalind had sustained a hematoma to the left

side of her head and had to undergo surgery to release the pressure and drain the blood. Rosalind had stitches to her forehead following the surgery.

Rosalind regretted stabbing Garcia, but she believed that he would have killed her if she had not defended herself. Garcia had been disrespectful and violent for a long time. As a young teenager, Garcia stopped obeying his parents and their house rules. Rosalind sent Garcia to live with his grandmother when he was 14 years old. Rosalind tried to get Garcia to move back in with her, but he refused. Garcia lived at his parents' house once or twice in his 20's or 30's. Rosalind testified that "twice he tried to change his life, but he didn't last three days in the house when he would start drinking or start up with problems."

## 2. **Rogers**

On April 13, 2022, Rogers saw Garcia slam the door, come into the living room, and start hitting Rosalind. Garcia beat Rosalind "from top to bottom, back and forth." Rosalind tried to defend herself, but she could not hit Garcia. Rogers tried to intervene. She was walking behind Rosalind when Garcia pushed her, and she fell onto Rosalind. Garcia called Rosalind a bitch and threatened to kill her. Rogers was afraid that Garcia would hurt her and/or Rosalind. Rogers did not see Rosalind stab Garcia. She saw Garcia flip over a coffee table, but she did not see him swinging a chair around.

6

**B.** *Defense*

Garcia testified that on April 13, 2022, he had been drinking to celebrate. Garcia had almost completed an electrical class and people were supporting him and helping him to get a job. He was on the back porch at his grandmother's house on the phone with his mother-in-law talking about an employment opportunity when Rosalind interrupted the conversation. Garcia got annoyed and hung up.

Garcia and Rosalind both walked to the front door because Rosalind said the neighbor was waiting to talk to Garcia about another job possibility. The front door was closed. Garcia and Rosalind got into a "push match," because Rosalind was trying to keep the door shut. Rosalind did not want the neighbor to help Garcia. She was upset that Garcia had been drinking. Rosalind wanted Garcia out of the house. She only permitted him to drink if she told him he could.

Rosalind got mad and threw her phone. She took off and went past Garcia's grandmother and into the kitchen. Garcia was confused and asked Rosalind what was going on. When he walked into the kitchen she had a knife. This did not surprise Garcia because he had seen her holding a knife when she argued with his father. Rosalind turned around and grabbed another knife. Garcia thought she was going to stop, but she lunged at him and stabbed him twice. Garcia pushed back towards the refrigerator. Rogers intervened and pushed Rosalind back.

At that point there was blood all over the floor, so Rosalind and Rogers were slipping. Garcia grabbed at the women to steady them. He was not able to use his right hand because he

had very limited mobility in that hand since the age of 18. Garcia's hand got slammed in a car door, and he could no longer move his thumb. While Garcia was trying to help Rosalind and Rogers, Rosalind was still stabbing him. Rosalind hit the counter with her back. Garcia did not know what to do. He was not sure whether he should try to pull his grandmother with him. He grabbed Rosalind and pushed her against the pantry door. He did not feel like he had a choice because he did not want to be stabbed or risk Rogers getting stabbed. Rosalind and Garcia went back and forth hitting the counter and ended up falling down. Rosalind hit her face on a metal trash can and hit her head on the pantry door as she was falling. All three of them ended up on the floor with Rosalind on the bottom, Garcia on top, and Rogers in the middle. Garcia pushed up off the floor. The women both looked alright to him. He called his friend from bible study to get help.

Garcia denied picking up a chair and swinging it during the incident. He did not threaten his mother. He acted in self-defense. The injuries that Rosalind suffered were not caused by the incident between her and Garcia.

Garcia admitted that he had sustained felony convictions for domestic violence and assault on a police officer.

8

# DISCUSSION

## A. *Admission of Evidence of Prior Uncharged Kidnapping*

### 1. <u>Legal Principles</u>

#### a. *Criminal Threats*

"Section 422 provides in pertinent part: 'Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, *with the specific intent that the statement is to be taken as a threat*, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat, and *thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety*, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.' " (*People v. Garrett* (1994) 30 Cal.App.4th 962, 966, fn. omitted.) "In order to establish a section 422 violation, the prosecution must establish (1) that the defendant had the specific intent that his statement would be taken as a threat (whether or

9

not he actually intended to carry the threat out) and, (2) that the victim was in a state of 'sustained fear.' " (*Ibid*.)

### b. *Hearsay Evidence*

Hearsay is " 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated[.]' " (*People v. Roa* (2017) 11 Cal.App.5th 428, 442; Evid. Code, § 1200, subd. (a).) Hearsay "is inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).)  A statement 'offered for some purpose other than to prove the fact stated,' however, is not hearsay.  (Sen. Com. on Judiciary com., 29B Pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1200, p. 3.)" (*People v. Roa*, at p. 442.)

### c. *Evidence Code Section 1101*

"Evidence Code section 1101, subdivision (a), provides that 'evidence of a person's character'—whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct—'is inadmissible when offered to prove [the person's] conduct on a specified occasion.'  This prohibition, however, does not preclude 'the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than [the person's] disposition to commit such an act,' including 'motive, opportunity, intent, preparation, [or]

10

plan.' (Evid. Code, § 1101, subd. (b).)" (*People v. Valdez* (2012) 55 Cal.4th 82, 129.)

"Under the Evidence Code, the truth of the prior uncharged act and defendant's connection to it are preliminary factual issues which must be decided before the prior misconduct can be deemed admissible; if the prior and defendant's connection to it are not established by a preponderance of the evidence, the prior is irrelevant to prove the Evidence Code section 101[, subdivision] (b) fact for which it is being offered. (*People v. Simon* (1986) 184 Cal.App.3d 125, 129–130; see Evid. Code, § 403, subd. (a).)" (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115.)

Even if the evidence is admissible under Evidence Code section 1101, subdivision (b), it is subject to exclusion under Evidence Code section 352 (*People v. Megown* (2018) 28 Cal.App.5th 157, 164), if "its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (Evid. Code, § 352).

On appeal, we review a trial court's admission of evidence for abuse of discretion. (*People v. Valdez, supra*, 55 Cal.4th at p. 133.)

## 2.    Proceedings

Prior to trial, the prosecution moved to introduce evidence of Garcia's prior bad acts pursuant to Evidence Code section 1101, subdivision (b). The trial court held an evidentiary hearing pursuant to Evidence Code section 402 to determine whether

11

certain anticipated testimony by Rosalind would be admitted at trial.

At the hearing, the prosecutor asked Rosalind about Garcia's past incidents of violence. Rosalind responded: "In his early years, I think when he was about 18, 19, him and a couple of friends had I want to say kidnapped somebody, held them hostage. I don't know actually what they did to him. He did prison time for that. He's beat up his girlfriends, beat up his wife, and he's constantly abusing people." Rosalind then elaborated on Garcia's violent treatment of his girlfriend, and his verbal abuse of Rosalind, his grandmother, and his aunt.

The court ruled that Rosalind could testify regarding her fears based on these past incidents, but instructed the prosecutor not to "go into details because we don't want to make a big production . . . ." The prosecutor agreed and stated that he had already admonished Rosalind not to mention any prior prison sentence in front of the jury.

Defense counsel objected to admission of the kidnapping testimony "because we don't know how many layers of hearsay or speculation there is between what she's going to testify to and as to what may or may not have occurred."

The court found all of the evidence admissible, but stated that it might instruct the jury that the evidence was being admitted for the limited purpose of evaluating Rosalind's mental state when Garcia threatened her and "not for the actual truth of any alleged crimes that the defendant may have committed."

In his opening statement, the prosecutor told the jury that Rosalind would testify that her son's behavior was violent and that he had unprovoked outbursts. The prosecutor argued: "She wanted him out of this house. She was worried not only about

12

his violent behavior, but violent behavior from him in the past: domestic violence, kidnapping things that very much frightened her."

Later, Rosalind testified regarding her fear when her son threatened her:

"[Rosalind]: When I fell down, he continued to hit me from the shoulders all the way down to my body saying that he was going to kill me.

"[Prosecutor]: Okay. What exactly—how exactly did he say that? And you can use his exact words. Please use his exact words.

"[Rosalind]: 'I'm going to kill you, bitch.'

"[Prosecutor]: And when he said that to you, were you scared?

"[Rosalind]: Yes.

"[Prosecutor]: And why were you scared?

"[Rosalind]: Because I felt that that's what he was going to do. He didn't stop. He kept hitting me from my shoulders all the way down.

"[Prosecutor]: Beyond just his actions that were going on in that moment, was there anything about what you knew of him that caused you to be frightened in that moment?

"[Defense counsel]: I have to renew my [Evidence Code section] 402 objection, and I'll submit."

Rosalind testified that Garcia had told her how he would injure people. Garcia described beating people from the head and down the side of the body to cause blood clots that could kill them. Rosalind also testified that Garcia beat up his wife and his girlfriends.

The court then admonished the jury: "Ladies and Gentlemen, for the record, this is being admitted for a limited purpose. It's being admitted only to the witness's state of mind with respect to the criminal threats or fear that she may have been in, and you're not to consider that evidence for any other purpose. Thank you. You may proceed."

The prosecutor then briefly questioned Rosalind regarding the kidnapping:

"[Prosecutor]: Were you—or do you have the belief that there's anything in his past involving kidnapping?

"[Rosalind]: Yes.

"[Prosecutor]: Tell me about that?

"[Rosalind]: I went to work one day and coworkers, my boss, was talking about, did you hear this story that happened right here in the neighborhood; that these two young men kidnapped a young guy. I believe they beat him up, kept him for—I don't know how many days—hostage. And I found out that was my son that had a part of this.

"[Prosecutor]: So all of this: the prior kidnapping, the prior domestic violence, your own observations of him, and the fact that he's hitting you profusely right now, did that all make you afraid of him?

"[Rosalind]: Yes."

After the presentation of evidence, the court admonished the jury pursuant to CALCRIM No. 303: "During the trial[,] certain evidence was admitted for a limited purpose . . . You may consider that evidence only for that purpose and no other . . . ."

In his closing statement, the prosecutor argued that Rosalind was frightened of Garcia: "As you've heard, the defendant, as [Rosalind is] very well aware of, has a very violent

14

past. She is scared of him from the very beginning. This is a man who has been convicted of assaulting a police officer, who has been convicted of battering a spouse, who she believes has kidnapped somebody as well, who has led a life that scares her." Later, the prosecutor argued that Rosalind feared Garcia when he threatened her: "I mean, obviously the fact that he's harming her, communicates that. But the fact that she's aware of his violent conduct in the past, that she's aware of that kidnapping, she's aware of the domestic violence abuse, she's afraid of him."

### 3. Analysis

Garcia contends that Rosalind's testimony regarding the alleged kidnapping evidence was cumulative, highly inflammatory because it was much more serious than the present offenses, had no probative value, and was unreliable. The People contend that Garcia forfeited his arguments by failing to make specific objections on these grounds at trial, but that regardless the arguments lack merit and any error was not prejudicial. We agree with the People.

In the trial court, defense counsel's sole objection was on grounds of "many layers of hearsay or speculation." This objection was insufficient to preserve a claim on the grounds he now alleges. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320 ["[a]s a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review"].) Even if Garcia's claims had not been forfeited, the trial court did not abuse its discretion by admitting Rosalind's testimony regarding the kidnapping.

15

On appeal, Garcia proceeds on the premise that the trial court admitted the kidnaping evidence under Evidence Code, sections 1101, subdivision (b) and 352. That position misstates the record. The trial court explained that the evidence was not being admitted for its truth (as a prior bad act), but as proof of Rosalind's mental state. In admitting the evidence, the court did not abuse its discretion. Garcia was charged with criminal threats. One element of that crime is that the jury must find that the threat causes the victim "reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422; *In re A.G.* (2020) 58 Cal.App.5th 647, 654.) Rosalind's belief that Garcia was dangerous and violent was relevant to whether her fear was reasonable under the circumstances. Her testimony was not admitted to prove that the kidnapping actually occurred. It was nonhearsay evidence admitted to show her state of mind based on what she believed her son had done.

Finally, Garcia was not prejudiced by admission of Rosalind's testimony under either the federal "beyond a reasonable doubt" or the state "reasonable probability of a more favorable outcome" standard of harmlessness. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [under federal standard reversal is required unless error is harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [under state standard reversal is required if it is reasonably probable that, but for the error, the defendant would have received a more favorable verdict].)

Rosalind's testimony regarding the kidnapping only encompassed a few sentences. She did not go into detail. It was clear from her testimony that she had no first-hand knowledge of

16

the kidnapping, but heard about it as a rumor. She did not specify Garcia's role in the crime or mention that she thought he served time in prison for the crime. She testified only that Garcia "had a part of [the kidnapping]," which was perpetrated by more than one individual. The prosecutor briefly mentioned the kidnapping in opening and closing arguments, but relied primarily on the severity of the beating that Rosalind received to prove his case. When Rosalind testified regarding the kidnaping, the trial court admonished the jury that it should consider the testimony of past uncharged acts only as evidence of "the witness's state of mind with respect to the criminal threats or fear that she may have been in, and you're not to consider that evidence for any other purpose." Prior to deliberations, the court again instructed the jury that it could only consider evidence offered for a limited purpose for that purpose. We presume that the jury understood and followed the court's instructions. (*People v. Trinh* (2014) 59 Cal.4th 216, 235.) Finally, the jury acquitted Garcia of assault with a deadly weapon in count 3, demonstrating that it did not allow bias to cloud its evaluation of the evidence.

## B.    *Sentencing Error*

Garcia contends, and the People concede, that the trial court erred when it sentenced Garcia, as a third-striker, to a term of 25 years to life in count 1 for assault by means likely to cause great bodily injury (§ 245, subdivision (a)(4)). Absent a finding that Garcia personally inflicted great bodily injury upon Rosalind, the offense is not a serious or violent felony within the meaning of the Three Strikes law. (See *People v. Leng* (1999) 71 Cal.App.4th 1, 9 ["A violation of [former] section 245, subdivision

17

(a)(1) is a serious felony only if the prosecution properly pleads and proves that the defendant 'personally inflict[ed] great bodily injury on any person, other than an accomplice[,]" or personally used a firearm or a dangerous or deadly weapon].)  When a defendant with two or more convictions for serious and/or violent felonies within the meaning of the Three Strikes law is convicted of a non-strike offense, the defendant must be sentenced as a second-striker with respect to that offense.  (*People v. Johnson* (2015) 61 Cal.4th 674; *People v. Lynn* (2015) 242 Cal.App.4th 594.)  Garcia should have been sentenced to double the imposed term in count 1.  (*People v. Johnson*, *supra*, at p. 690.)  Because the sentence was unauthorized, we remand the matter to the trial court for a full resentencing hearing.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

We vacate the sentence and remand to the trial court to conduct a full resentencing hearing.  In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED.


MOOR, J.

WE CONCUR:


HOFFSTADT, P. J.

BAKER, J.

18